**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

CINDY BRACKETT
515 Egypt Road
Kearneysville, West Virginia 25430,

*Plaintiff,*

v.

JOHN KELLY, Secretary
Department of Homeland Security
245 Murray Lane, S.W.
Washington, D.C. 20528-0075

Parties to be served:

Ronald C. Machen, Jr.
United States Attorney
United States Attorney's Office
For the District of Columbia
555 4th Street, N.W.,
Washington, D.C. 20530

Jeffrey Sessions
Attorney General of the United States
Department of Justice
950 Pennsylvania Avenue, N.W.,
Washington, D.C. 20530

JOHN KELLY, Secretary
Department of Homeland Security
245 Murray Lane, S.W.
Washington, D.C. 20528-0075,

*Defendant.*

Civil Case No.:

## COMPLAINT

Plaintiff, Cindy Brackett, by the law firm of Melehy & Associates, LLC, hereby brings suit against Defendant, John Kelly, Secretary, Department of Homeland Security ("the Agency" or "Defendant") discriminatory and retaliatory adverse actions, materially adverse actions and harassment and a failure to reasonably accommodate Plaintiff in violation of the Rehabilitation Act 1973, 29 U.S.C. §§ 791, 793 and 794 (incorporating the standards of the Americans with Disabilities Act, 42 U.S.C. §§ 12203 and 42 U.S.C. § 1981a). In support of the Complaint, Plaintiff alleges as follows:

## JURISDICTION

1. The Jurisdiction of this Court is based upon 28 U.S.C. §1331 relating to "any civil action or proceeding arising under any Act of Congress regulating commerce."

## VENUE

2. Defendant is the head of a governmental unit of the United States that does business in and is headquartered in the District of Columbia.

3. At all times relevant to this case, Plaintiff was employed by the Agency.

4. At all times relevant to the Complaint, two of the Agency managers responsible for the discrimination (Donna Bennett, Adrian Gardner) were employed at the FEMA Headquarters located at 500 C Street, Southwest, Washington DC 20472. The third manager responsible for the discrimination (Gerald Singleton) was employed at FEMA's offices located at 615 Chestnut Street, One Independence Mall, Sixth floor, Philadelphia, PA 19106.

5. Thus, the cause of action arises in the District of Columbia and venue is proper in the District of Columbia under 28 U.S.C. § 1391.

## STATEMENT OF FACTS

6. Plaintiff is a Caucasian female born on June 20, 1969. She is a current employee of the Federal Emergency Management Agency ("FEMA"), the Cyber Security Division, which is part of the Agency. Her career with the federal government spans nearly 25 years. She began her employment with FEMA in 1991. In 2003, the Agency hired her in the Office of Cyber Security as a Program Analyst, GS-09 for the Engineering section of FEMA. On June 20, 2010, the Agency competitively selected her for the position of Information Technology Specialist, GS-2210-13, the same position she now holds. On June 20, 2012, the Agency gave her a career ladder promotion to the GS-14 level, but the position Plaintiff held remained the same.

7. As of June 20, 2012, Plaintiff had the following job duties:

(a) handling identity and credential access requests by employees, contractors and outside agencies;
(b) Lead for Katrina Fraud Task Force, which consisted of working with other federal agencies to track individuals the committed fraud during the Hurricane Katrina disaster;
(c) Lead for Law Enforcement Office which consisted of working with FEMA's Law Enforcement Office and other federal agencies to track sex offenders that
(d) were unaccounted for after disasters occurred;
(e) Lead for CompuTrace which was FEMA's Asset Tracking Software to find lost or stolen laptops;
(f) Lead for Office of Inspector General Account Access Requests, which involved processing and tracking Office of Inspector General ("OIG") access to the FEMA network;
(g) Lead for Homeland Secure Data Network Access Requests, which including processing and tracking of requests by all FEMA users that required access to this secure network;
(h) Lead for Shared Email Account Requests, which included processing and tracking all shared email accounts for FEMA users that required these types of accounts;
(i) Lead for Elevated Privilege Network Access Requests, which included processing and tracking of all accounts for FEMA users that required Elevated Privileges to the FEMA network to perform their duties;
(j) Custodial Officer which consisted of tracking all Cyber Security inventory and equipment at the Mount Weather Virginia site; and
(k) Timekeeper for the Cyber Security Division.

8. Plaintiff's performance ratings in her current position beginning in 2010 were done on a three-tier scale – "Unsatisfactory"; "Proficient"; and "Superior". The performance period was from October 1 to September 30, up to January 1, 2014, when the performance period was changed by the Agency to a calendar year. Her ratings were as follows: Fiscal Year ("FY") 2011 (October 1, 2010 to September 30, 2011)(Proficient); FY2012 (October 1, 2011 to September 30, 2012)(Proficient); and FY2013 (October 1, 2012 to September 30, 2013)(Proficient). Plaintiff had received Superior ratings in the prior years, and also received cash and/or time off awards numerous times. Plaintiff received a satisfactory rating for calendar year 2014, but no final rating for calendar year 2015.

9. Elisa Cruz was the Chief Information Security Officer from October 2006 to March, 2012. LaMonte Yarborough occupied the position from March, 2012 through November 2012. From 2006 through November, 2012, Gerald Singleton was acting Deputy Chief Information Security Officer. From December 1, 2012 until March 10, 2014, Gerald Singleton was acting Chief of Information Security Officer and Plaintiff's first level supervisor. On March 10, 2014 Donna Bennett became the Chief Information Security Officer; at that time, Singleton became the acting Deputy Chief Information Security Officer and he remained in that capacity, officially or unofficially, until late October, 2014, and continued to act as Plaintiff's supervisor until sometime in 2015, even signing her FY2014 performance review as her supervisor. During the time that Singleton was Plaintiff's first line supervisor, Bennett was Plaintiff's second line supervisor. When Singleton vacated the acting Deputy Chief position, sometime in 2015, Bennett became Plaintiff's first line supervisor. From September 2013 to the present, Adrian Gardner was the Chief Information Officer and Bennett reported directly to him.

10. In April 2010, when her Lyme disease had been misdiagnosed as vertigo, there was a multi-week period when Elisa Cruz permitted Plaintiff to work from home, as a reasonable accommodation, after Plaintiff became dizzy in the shower and fell and broke two ribs.

11. In 2011, Plaintiff was diagnosed with Lyme disease and she began a treatment regimen. The affects and/or symptoms suffered by Plaintiff in 2011, when the disease reached an acute stage, include but are not limited to the following: (1) neurological impairment caused by nerve damage; (2) severe joint pain; (3) chronic fatigue; (4) insomnia; (5) headaches; (6) hyper-sensitivity to light and sound; (7) low blood pressure; (8) dizzy spells and fainting; (9) periodic loss of vision in her left eye; and (10) nausea and loss of appetite. During 2011, when the disease was in an active state, it substantially limited the following of Plaintiff's major life activities: (1) walking; (2) exercising; (3) neurological function; (4) eating; (5) sleeping; (6) driving; (7) performing manual tasks; (8) standing; (9) sitting; (10) lifting; and (11) caring for herself.

12. After the diagnosis in 2011, Plaintiff engaged in protected activity by informing her acting first line supervisor, Singleton, and her second line supervisor, Elisa Cruz, of her disability. Singleton and/or Cruz permitted Plaintiff, pursuant to a written agreement, to telework, as an accommodation for her disability. Plaintiff engaged telework for a 30-day period initially and then on an as-needed basis after that.

13. In June, 2013, the symptoms associated with Plaintiff's disability worsened and she informed Singleton of this. As an accommodation to Plaintiff, Singleton signed a written telework agreement authorizing Plaintiff to telework full time. The Agreement was in effect for one year – until June, 2014.

14. In July, 2013, a Lyme disease specialist diagnosed Plaintiff with chronic Lyme Disease, a more serious form of the disease, which is known to cause permanent neurological damage. Plaintiff does indeed have permanent neurological damage from the disease.

15. In March of 2014, the Agency selected Donna Bennet to fill the position of Chief Information Security Officer and she became Plaintiff's second line supervisor. In March, 2014, Plaintiff engaged in protected activity by informing Donna Bennett that she had been diagnosed with Lyme Disease, the symptoms of the disease, and the fact that she was on a five-day telework status as a reasonable accommodation of her disability.

16. Beginning in April 2014 and continuing throughout Plaintiff's tenure at the Agency, Bennett had substantially less work-related contact with Plaintiff than the approximately 16 other Information Technology Specialists she supervised, who do not have disabilities and who are not on full-time telework as accommodation of a disability and who had not engaged in protected activity by claiming a disability, seeking reasonable accommodation for it and receiving and utilizing the benefits of reasonable accommodation.

17. In May, 2014, at Bennett's direction, Singleton assigned Plaintiff budgetary duties. Specifically, Singleton and Bennett assigned Plaintiff the task of managing the 28 million dollar budget of the Cyber Security Division, even though these duties were outside of Plaintiff's job description. This meant that Plaintiff would make and receive recommendations about how the funds were to be spent, prepare procurement packages for signature, monitor spending through the budgetary process to ensure that it is within budget process and track the status of the available of funding. These duties were not in Plaintiff's job description nor had Plaintiff performed them for several years. For FY 2014, FEMA's deadline for spending its funds through procurement packages was June 25, 2014; if it did not meet the deadline, it would lose those unspent funds. Typically, the

budgetary duty workload was high because procurement contracts for any residual funds needed to be executed.

18. At the time Singleton assigned the budgetary duties to Plaintiff, she informed Singleton that she was going to be on leave at a wedding in Nashville from June 20 to 25, 2014. Plaintiff told Singleton that, if necessary, she could work on the budget around her schedule and Singleton agreed that it might be necessary. Plaintiff and Singleton agreed that Plaintiff would submit leave for two travel days, June 20 and 25, and that, in the event that Plaintiff worked on June 20 or 25 or required leave for one or more other days during her trip, she would make the appropriate changes or submit the appropriate leave requests upon her return. This was not unusual, as Plaintiff and Singleton had followed this procedure in the past. Plaintiff applied for this leave on May 23, 2014, by submitting a request for leave to Singleton, who was, at the time, her time Certifier and first line supervisor. Singleton approved the request in July 2014, after Plaintiff returned from her trip, although the leave was not used. Plaintiff ended up working 8 hours every day of her trip. When she returned, she and Singleton agreed that she would not use any leave to cover the period of her trip. Plaintiff made the appropriate changes and Singleton certified Plaintiff's time and attendance sheet.

19. On June 20, 23, 24 and 25, 2014, Plaintiff performed eight or more hours of work per day on the budgetary duties. Much of her work during that period involved email communication with Singleton and Bennett about procurement contracts that needed to be signed. At the end of the pay period (June 28, 2014), Plaintiff reported her time in the Agency's WebTA system, an electronic time-keeping program. Because she was working on June 20, 23, 24 and 25, she reported on WebTA that she worked eight hours each day. While there are other settings like alternative work site, the default setting is that Plaintiff worked from her home. Plaintiff

inadvertently did not change the default setting so that the records indicated that she worked from home. On June 27, 2014, Singleton certified that Plaintiff's time records in WebTA were correct.

20. Beginning in August, 2014, Bennett prevented Plaintiff from efficiently performing her job duties by interfering, delaying or blocking her efforts to obtain a replacement lap top when her lap top developed technical problems.

21. In late November, 2014, Bennett removed Plaintiff's budgetary duties and assigned them to two persons who did not have disabilities, who had not engaged in protected activity and who were not on full-time telework as a reasonable accommodation.

22. In November, 2014, Bennett made negative remarks about Plaintiff's full-time telework agreement and falsely stated or implied that it was negatively affecting her ability to do her job.

23. In late January, 2015, Bennett removed the following of Plaintiff's duties: Lead for Special Account Access; duty for approving access to the Homeland Secure Data Network ("HSDN"); and duty for approving access to the Office of Inspector General Virtual Private Network.

24. In January or February 2015, the Agency interfered with the EEO process by refusing to process Plaintiff's discrimination complaint, advising her that her complaint had no merit and discouraging her from filing it.

25. On February 3, 2015, Bennett informed Plaintiff that she would be performing cyber security training, but only temporarily, until a GS-14 individual could be hired who would perform those duties.

26. On March 19, 2015, Bennett criticized Plaintiff's job performance concerning a leave audit that Plaintiff had performed.

27. On March 25, 2015, Bennett contacted Plaintiff and informed her that she needed to come to the office for a counseling session related to her job performance.

28. On March 30, 2015, through her attorney, Plaintiff initiated a claim of discrimination and retaliation against the Agency by sending a letter alleging that the Agency had discriminated against her on the basis of disability and retaliated against her for engaging in protected activity (requesting, negotiating and receiving reasonable accommodation in the form of telework). The informal complaint named Bennett as the responsible management official. That same day, March 30, 2015, Plaintiff's counsel sent a copy of the informal discrimination complaint to Donna Bennett.

29. On April 21, 2015, the EEO Counselor contacted Bennett, informed her of the allegations and discussed them with her.

30. On April 24, 2015, Bennett scheduled an all-hands meeting for the employees of the Cyber Security Office and failed to provide Plaintiff with reasonable accommodation such that she could not meaningfully participate in the meeting, including but not limited to failing to provide an adequate telephone connection and access to the power point slides.

31. On May 1, 2015, through her counsel, Plaintiff filed a formal complaint of discrimination with the Agency's EEO Office, alleging discriminatory and retaliatory adverse actions and materially adverse actions along with discriminatory and retaliatory harassment. The Complaint alleged the following:

(a) Beginning in April 2014, when she began supervising Plaintiff, Donna Bennett has had substantially less work-related contact with Plaintiff than the approximately 16 other Information Technology Specialists she supervises, who do not have disabilities and who are not on full-time telework;
(b) To date, Bennett has failed to complete any quarterly or final performance evaluations for Plaintiff;
(c) To date, Bennett has failed to meet with Plaintiff regarding her performance standards and failed to place Plaintiff on performance standards;

(d) Beginning in August, 2014, Bennett prevented Plaintiff from efficiently performing her job duties by interfering, delaying or blocking her efforts to obtain an replacement lap top when her lap top developed technical problems;
(e) In late November, 2014, Bennett removed Plaintiff's budgetary duties and assigned them to two persons who did not have disabilities and who were not on full-time telework;
(f) In November, 2014, Bennett made negative remarks about Plaintiff's full-time telework agreement and falsely stated or implied that it was negatively affecting her ability to do her job;
(g) In late January, 2015, Bennett removed the following duties performed by Plaintiff: Lead for Special Account Access; duty for approving access to the HSDN; and for approving access to the Office of Inspector General Virtual Private Network;
(h) In January or February 2015, the Agency interfered with the EEO process by refusing to process Plaintiff's discrimination complaint, advising her that her complaint had no merit and discouraging her from filing it;
(i) On February 3, 2015, Bennett informed Plaintiff that she would be performing cyber security training, but only temporarily, until a GS-14 individual could be hired who would perform those duties;
(j) On March 19, 2015, Bennett unjustifiably criticized Plaintiff's job performance concerning a leave audit that Plaintiff had performed;
(k) On March 25, 2015, Bennett contacted Plaintiff and informed her that she needed to come to the office for a counseling session related to her job performance.

32. On or about May 7 and/or 8, 2014 and subsequently, Bennett and/or Singleton communicated knowingly false information to the Agency's Personal Security Division for the express purpose of discriminating/retaliating against Plaintiff by facilitating the suspension of Plaintiff's security clearance, her indefinite suspension and, ultimately the termination of Plaintiff's employment. Said knowingly false information/statements include but are not limited to the following: (1) that Singleton was not Plaintiff's supervisor; (2) that Singleton did not authorize Plaintiff to telework from a work site other than her home; (3) that neither Singleton nor Bennett authorized Plaintiff to telework from a work site other than her home or to telework during her vacation; (4) that Plaintiff provided a doctor's note to the Agency, which stated that Plaintiff was medically unable to travel; (5) that Plaintiff was never authorized to telework at any location besides her home; (6) that Plaintiff had committed time sheet fraud or made materially false statements on

her time and attendance records; and (7) other similar or related knowingly false statements to be uncovered during the investigation or during discovery.

33. On November 19, 2015, because of Singleton's and/or Bennett's knowingly false statements to the Personnel Security Division, Office of the Chief Security Officer, concerning Plaintiff, the Agency suspended Plaintiff's security clearance.

34. On November 20, 2015, Donna Bennett placed Plaintiff on administrative leave, relieving her of the one job duty she had (timekeeping).

35. On December 8, 2015, Donna Bennett issued a Notice of Proposed Indefinite Suspension of Plaintiff.

36. On March 22, 2016, the Agency (Adrian Gardner) issued a decision suspending Plaintiff without pay indefinitely.

37. On March 22, 2016, the Agency (Adrian Garner) decided not to reassign Plaintiff or change her duties so that she could work without a security clearance.

38. On or about July 15, 2016, the Agency lifted Plaintiff's indefinite suspension and placed her back in duty status. At that time, Donna Bennett was Plaintiff's supervisor. The Agency designated Craig Wilson as Plaintiff's team lead. However, the Agency failed to restore Plaintiff's job duties and Plaintiff had no job duties for approximately five months after being returned to duty status.

39. From her reinstatement on July 15, 2016 until November 29, 2016, the Agency assigned no duties to Plaintiff, a more than 25-year veteran of the federal government, who spent this time watching training videos and reviewing security documents.

40. On November 29, 2016, Plaintiff's Section Leader Craig Wilson assigned Plaintiff her first duty after reinstatement -- revising an existing Standard Operating Procedure ("SOP")

document relating to Accounts Management, which Plaintiff completed on or about December 22, 2016.

41. Plaintiff did not receive another duty until February 6, 2017, when Wilson tasked her with preparing a revised, second version of the SOP document. She finished this on May 9, 2017.

42. On February 19, 2017, Donna Bennett was placed on a 90-day detail to Department of Homeland Security.

43. On February 27, 2017, Wilson assigned Plaintiff the following goals and objectives: (1) Develop and implement of FEMA Cyber Security policies, procedures and guidelines; (2) Continue standard operating procedure documents to fruition; (3) Develop material for promotion of security education and awareness.

44. In April and May, 2017, Wilson finally assigned Plaintiff a full set of duties and responsibilities.

## COUNT I
## (DISCRIMINATION AND RETALIATION IN VIOLATION OF THE REBILITATION ACT, AS AMENDED)

45. Paragraphs 1-44 of this Complaint are hereby incorporated by reference.

46. Defendant violated the Rehabilitation Act by failing to reasonably accommodate her disability and by engaging in a pattern of discriminatory and retaliatory harassment, discriminating and retaliating against her and committing a series of adverse and materially adverse actions as indicated below:

a. Beginning in April 2014, when she began supervising Plaintiff, Bennett had substantially less work-related contact with Plaintiff than the approximately

16 other Information Technology Specialists she supervises, who do not have disabilities and who are not on full-time telework;

b. Bennett failed to complete and provide Plaintiff with any quarterly reviews (written or otherwise) or a final performance evaluations for Plaintiff for calendar year 2015;

c. Bennett failed to meet with Plaintiff regarding her performance standards and failed to place Plaintiff on performance standards for calendar year 2015 appraisal period;

d. Beginning in August, 2014, Bennett prevented Plaintiff from efficiently performing her job duties by interfering, delaying or blocking her efforts to obtain a replacement laptop when her laptop developed technical problems;

e. In late November, 2014, Bennett removed Plaintiff's budgetary duties and assigned them to two persons who did not have disabilities and who were not on full-time telework;

f. In November, 2014, Bennett made negative remarks about Plaintiff's full-time telework agreement and falsely stated or implied that it was negatively affecting Plaintiff's ability to do her job;

g. In late January, 2015, Bennett removed the following duties performed by Plaintiff: Lead for Special Account Access; approving access to the HSDN; and approving access to the Office of Inspector General Virtual Private Network;

h. On February 3, 2015, Bennett informed Plaintiff that she would be performing cyber security training, but only temporarily, until a GS-14 individual could be hired who would perform those duties;

i. On March 19, 2015, Bennett unjustifiably criticized Plaintiff's job performance concerning a leave audit that Plaintiff had performed;

j. On March 25, 2015, Bennett contacted Plaintiff and informed her that she needed to come to the office for a counseling session related to her job performance;

k. Beginning on or about May 7 and/or 8, 2015 and continuing through October, 2015, Bennett and/or Singleton, communicated knowingly false information/statements to the Agency's Personal Security Division. Said knowingly false information/statements include but are not limited to the following: (1) that Singleton was not Plaintiff's supervisor; (2) that Singleton did not authorize Plaintiff to telework from a work site other than her home; (3) that neither Singleton nor Bennett authorized Plaintiff to telework from a work site other than her home or to telework during her vacation; (4) that Plaintiff provided a doctor's note to the Agency, which stated that Plaintiff was medically unable to travel; (5) that Plaintiff was never authorized to telework at any location besides her home; (6) that Plaintiff had committed time sheet fraud or made materially false statements on her time and attendance records; and (7) other similar or related knowingly false statements to be uncovered during the investigation or during discovery.

l. Said knowingly false statements caused the Office of the Chief Security Officer to suspend Plaintiff's security clearance on November 19, 2015;

m. On November 20, 2015, Bennett placed Plaintiff on paid administrative leave, relieving her of the one job duty she had (timekeeping);

n. On December 8, 2015, Bennett issued a Notice of Proposed Indefinite Suspension of Plaintiff;

o. On March 22, 2016, the Agency (Adrian Gardner) issued a decision suspending Complainant without pay indefinitely;

p. On March 22, 2016, the Agency (Adrian Garner) decided not to reassign Plaintiff or change her duties so that she could remain employed without a clearance;

q. On March 22, 2016, the Agency constructively discharged Plaintiff from her position by cutting off her pay and, through a pattern of unrelenting discrimination and discriminatory harassment, making her working conditions so intolerable, including having severe adverse impact on her health, that the Agency has effectively ended her employment.

47. Plaintiff exhausted her administrative remedies as to all claims in paragraph 46 (a) through (q) by making timely contact about them with the Agency's EEO Office, filing timely formal complaints of discrimination (or amendments thereto) and waiting more than 180 days after the formal complainants were filed or the amendments were made.

48. On May 4, 2017, the Defendant issued a Final Agency Decision, finding that it did not discriminate against Plaintiff.

49. Because of the Defendant's discriminatory and retaliatory actions, Plaintiff suffered extremely severe emotional and psychological distress, including but not limited to almost complete physical and mental incapacitation, depression, anxiety, loss of appetite, loss of sleep, a temporary inability to work, physical pain, humiliation, embarrassment, loss of reputation and other damages.

50. Plaintiff plans to present evidence and prove her discrimination and retaliation claims under two alternative legal theories. Plaintiff will proceed under the three-part evidentiary framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Plaintiff will alternatively proceed under the mixed motive framework.

WHEREFORE, Plaintiff requests the following relief: (a) such compensatory damages as a jury might award; (b) such economic damages as a jury might award including back pay and front pay, if applicable; (c) such other damages as a jury might award; (d) attorney's fees and costs; (e) a performance appraisal for calendar year 2015; (f) expungement of records related to unlawful suspension.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues triable to a jury as a matter of right.

Respectfully submitted,

/s/ Omar Vincent Melehy
Omar Vincent Melehy, Esq.
D.C. Bar No. 415849
MELEHY & ASSOCIATES, LLC
8403 Colesville Rd., Suite 610
Silver Spring, MD 20910
Phone: (301) 587-6364
Fax: (301) 587-6308
Email: ovmelehy@melehylaw.com
*Attorneys for Plaintiff*