**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**CINDY BRACKETT,**

    **Plaintiff,**

      v.

**ALEJANDRO MAYORKAS, Secretary,
Department of Homeland Security,**

    **Defendant.**

</td><td>

Civil Action No. 17-988 (JEB)

</td></tr>
</table>

## <u>MEMORANDUM OPINION</u>

Although the COVID-19 pandemic brought remote work to the fore, this employment suit is proof that workplace disputes about telecommuting arose long before the pandemic's onset.  Plaintiff Cindy Brackett has worked for decades at the Federal Emergency Management Agency, and she has been permitted to work from home since 2010 because of her Lyme disease and associated medical conditions.  The primary event giving rise to this lawsuit was Brackett's six-day family trip to Tennessee in June 2014; although she claims that she worked while on the road, her timecard inadvertently indicated that she was at home.  Approximately a year after the trip — and shortly after Plaintiff filed an EEO complaint and formally requested a reasonable accommodation for her disability — her supervisor reported the timecard incident as fraud, which led to an internal investigation and the suspension of Brackett's security clearance, job, and pay.

After filing multiple administrative complaints, Plaintiff brought this Rehabilitation Act lawsuit in 2017.  With discovery now closed, Defendant Alejandro Mayorkas, Secretary of Homeland Security, moves to dismiss and for summary judgment, contending that Brackett's

claims are not justiciable under <u>Department of Navy v. Egan</u>, 484 U.S. 518 (1988); that she

failed to administratively exhaust her claims; and that, in any event, many of her complaints do

not involve adverse employment actions.  As the Court rejects the threshold arguments but

agrees as to some of the adverse-action contentions, it will deny the Motion in part and grant it in

part.

**I.      Background**

      A.  <u>Factual Background</u>

Because the Court is considering Defendant's Motion for Summary Judgment, it will

construe the facts in the light most favorable to Plaintiff.  <u>See</u> <u>Talavera v. Shah</u>, 638 F.3d 303,

308 (D.C. Cir. 2011).

Brackett has been employed by FEMA — an agency housed in the Department of

Homeland Security — since 1991, working most of that time as a Program Analyst.  <u>See</u> ECF

No. 72-1 (Pl. Resp. to Def. SMF) at 1.  Starting in 2010, Plaintiff's then-supervisor permitted her

to telework full time after an incident in which she became dizzy, fell, and broke several ribs.  <u>Id.</u>

Brackett was diagnosed with Lyme disease in 2011, at which time she informed her supervisors

of her condition.  <u>Id.</u> at 2.  Those supervisors — one of whom was Gerald Singleton, who is still

Plaintiff's supervisor today — responded by permitting her to continue teleworking, starting with

a 30-day period and on an as-needed basis thereafter.  <u>Id.</u>  In 2013, Singleton signed a written

agreement authorizing Brackett, who was still suffering from Lyme disease, to telework for a

one-year period.  <u>Id.</u>

In March 2014, Defendant hired Donna Bennett to the position of Chief Information

Security Officer, and she became Plaintiff's second-line supervisor, above Singleton.  <u>Id.</u> at 3.

Shortly thereafter, Brackett informed Bennett that she had Lyme disease.  <u>Id.</u>  Then, in October

2014, Bennett notified all employees she supervised, including Brackett, that any past telework agreements did not automatically carry over from prior supervisors.  Id. at 3–4.  Plaintiff nonetheless continued to telework through April 2015 with her supervisors' permission, although the parties dispute whether Singleton was merely exercising discretion to permit continued teleworking or whether Defendant was fulfilling a reasonable-accommodation request during that period.  Id. at 4–5.  That arrangement lasted until May 2015, when all agree that Brackett requested a reasonable accommodation that would allow her to telework on a permanent basis. Id. at 7.

The primary events giving rise to this lawsuit began in spring 2014, after Bennett became one of Plaintiff's supervisors.  In May of that year, Singleton assigned Brackett, with Bennett's approval, the task of managing the agency's Cyber Security Division's multimillion-dollar budget.  See ECF No. 65, Exh. 7 (Deposition of Donna Bennett) at 130–33; ECF No. 65, Exh. 1 (Pl. Ans. to Inter.) at 5.  Because of an internal budget deadline of June 30, there was a substantial workload to be completed that month.  See Bennett Depo. at 107–08, 130–33; ECF No. 65, Exh. 2 (Deposition of Gerald Singleton) at 31–34.  When Brackett was assigned the task, she informed Singleton that she was going to be on vacation in Tennessee for a wedding from June 20–25.  See Singleton Depo. at 38–39; Pl. Ans. to Inter. at 5.  Singleton had previously authorized Plaintiff to telework from places other than her home.  See Singleton Depo. at 43–48; ECF No. 65, Exh. 13 (Singleton Emails) at 1–2.  This time, he was aware that she planned to work on an as-needed basis while in Tennessee.  See Pl. Ans. to Inter. at 5; Singleton Depo. at 38–40, 70.

During the June 20–25 period, Brackett proceeded to work when she could while traveling and away from home.  Although the parties dispute precisely which hours she worked

on which dates, email records indicate that Plaintiff worked for at least some time on June 20,

24, and 25, while June 21–22 fell over the weekend.  See ECF No. 65, Exh. 43 (June 20–25

Emails) at 1–58.  These emails included messages among Brackett, Bennett, and Singleton.  Id.

Plaintiff incorrectly indicated on her timecard that she had teleworked from home on those days,

although she has since averred that she inadvertently forgot to annotate that she had been

working from Tennessee.  See ECF No. 65, Exh. 8 (June 2014 Timecard); Pl. Ans. to Inter. at 5–

6.  Singleton certified the timecard entry even though he knew that she had not been at home.

See June 2014 Timecard; ECF No. 65, Exh. 16 (Singleton Email June 20, 2014).  He had

similarly certified timecard entries in the past when he knew that Brackett was teleworking away

from home, and he neglected to change her telework location entry.  See ECF No. 65, Exh. 14

(November 2013 Timecard); ECF No. 65, Exh. 15 (March 2014 Timecard).  Neither Singleton

nor Bennett raised an issue with the June 2014 timecard at the time.

On March 30, 2015, Brackett initiated (via counsel) a written complaint against the

agency for alleged harassment, discrimination, failure to accommodate, and retaliation, on the

basis of her disability and race (White), concerning employment actions unrelated to the June

2014 trip or her security clearance.  See ECF No. 65, Exh. 23 (EEO Informal Complaint) at 1–6.

Bennett became aware of the Complaint on April 21, when the EEOC Counselor contacted her.

See Bennett Depo. at 206–11.  Plaintiff filed a formal Complaint with the agency on April 30.

See ECF No. 65, Exh. 46 (First Administrative Complaint).  Then, on May 7, Brackett contacted

Bennett directly, seeking a formal reasonable accommodation that would permit her to telework

indefinitely going forward.  See ECF No. 65, Exh. 27 (Reasonable Accommodation Request) at

1–6; ECF No. 60-15 (Reasonable Accommodation Letter) at 1.  The communication to Bennett

included a letter from Dr. Joseph Jemsek, Brackett's doctor, stating that Plaintiff suffered from

"Lyme Borreliosis Complex, a chronic, multisystemic, inflammatory illness, and its associated conditions."  Reasonable Accommodation Letter at 1.  Dr. Jemsek "request[ed] that Ms. Brackett be permitted to continue with telework (remote work) accommodations."  Id.  Defendant approved the reasonable accommodation in October 2015, and the accommodation remained in effect when this lawsuit was filed in 2017.  See Pl. Resp. to Def. SMF at 8–9.

The day after receiving the reasonable-accommodation request, Bennett contacted J'son Tyson in the agency's Personal Security Division concerning Plaintiff's timecard entry from June 20–25 of the prior year.  See Bennett Depo. at 60–65.  According to Bennett, she did so because another employee, Patrice Arnold, had alerted Bennett to photos she had found of Plaintiff traveling during business hours on those dates.  Id.; see also ECF No. 65, Exh. 28 (Patrice Arnold Depo.) at 15–20.  The parties vigorously dispute precisely what Bennett told Tyson during their call, but there is little doubt that, after the call, Tyson contacted John Rooney, Chief of the agency's Fraud and Internal Investigations Division (FIID).  See ECF No. 65, Exh. 30 (J'Son Tyson Depo.) at 7–10.  Rooney understood the issue to involve a violation of FEMA's telework policy, and he assigned the case to Owen Igo within FIID.  See ECF No. 65, Exh. 48 (John Rooney Depo.) at 12–14.

Igo conducted an investigation, which included gathering statements from Bennett and Singleton.  While the Court need not dwell on the details of that investigation at this juncture, it culminated in Igo's issuing a Report of Investigation concluding that "the allegations of failure to comply with FEMA's Telework Manual [] and time and attendance fraud be deemed substantiated."  ECF No. 65, Exh. 32 (FIID Report) at 3.  That Report was sent to the Personal Security Division of the agency, which was headed by Lynconyer Young.  After reviewing the Report, Young and the Chief Security Officer suspended Brackett's "access to classified

information and Sensitive Compartmented Information."  ECF No. 60-38, Exh. JJ (Notice of

Suspension of Clearance) at 1.  FEMA then put Brackett on "suspension from duty and pay

pending final adjudication of [her] eligibility for access to classified information, a requirement

for [her] position."  ECF No. 65, Exh. 35 (Notice of Suspension) at 1.  The notice made clear that

the action was "being proposed solely because [Plaintiff's] security clearance has been

suspended and [she] cannot currently satisfy this essential requirement for [her] position, not

because of any underlying misconduct."  Id.  In March 2016, the suspension without pay was

continued indefinitely.  See Pl. Resp. to Def. SMF at 19.

    In July 2016, FEMA reinstated Brackett's security clearance.  Id. at 25.  She returned to

duty shortly thereafter and resumed her work for FEMA, which has continued through this

litigation.

    B.  Procedural History

    As referenced above, Plaintiff filed an administrative complaint with the agency in spring

2015.  She filed a second administrative complaint in December of that year.  See ECF No. 65,

Exh. 53 (EEO Procedural Dismissal) at 1–2.  Defendant issued a Final Agency Decision as to the

first complaint on May 4, 2017, and it later issued a Procedural Dismissal as to the second

complaint.  See ECF No. 65, Exh. 54 (EEO FAD); EEO Procedural Dismissal at 1–3.  Brackett

filed this lawsuit on May 24, 2017.  See ECF No. 1 (Complaint).  She amended the Complaint

twice, with the operative Second Amended Complaint being filed in October 2019.  See ECF No.

39 (SAC).  That pleading alleges one count, unhelpfully broken into eleven subparts, and claims

disability discrimination and retaliation, as well as perhaps a failure to reasonably accommodate

Plaintiff's disability and a hostile work environment, though the latter two claims are not made

out with particular lucidity.  After discovery closed in 2020, Defendant moved to dismiss or for

summary judgment.  Because both parties' filings failed to comply with the Local Rules, the Court ordered them to refile, and Defendant renewed this Motion in summer 2021.  See ECF No. 70-1 (Def. MSJ).

## II.   Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails to "state a claim upon which relief can be granted."  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  In evaluating a motion to dismiss, the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation omitted) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)).  The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint.  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Under Rule 56(a), meanwhile, summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "'genuine' if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party."  Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998).  The Court must "eschew making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).  The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-movant, in other words, is required to provide evidence that would permit a reasonable jury to find in his favor.  See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## III.    Analysis

Defendant raises three distinct arguments in its Motion.  First, it contends that all of Plaintiff's claims are nonjusticiable under Egan because they arise from FEMA's nonreviewable decision to suspend her security clearance.  See Def. MSJ at 21–35.  Second, the Government argues that most of Brackett's claims were not properly exhausted with the agency and thus cannot be considered.  Id. at 35–41.  Last, it submits that even if the Court reaches the merits, it

should conclude that many of the employment decisions she challenges were not adverse employment actions.  Id. at 41–45.  The Court considers each position in turn and concludes with a discussion of remaining issues.

A.  Justiciability

In Egan, the Supreme Court held that the Merit Systems Protection Board lacked authority "to review the substance of an underlying decision to deny or revoke a security clearance" "where the grant of security clearance to a particular employee [is] a sensitive and inherently discretionary judgment call . . . committed by law to the appropriate agency of the Executive Branch."  484 U.S. at 520, 527.  The Court explained that "the protection of classified information must be committed to the broad discretion of the agency responsible," and that "it is not reasonably possible for an outside non[-]expert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction [of potential risk] with confidence."  Id. at 529.

The D.C. Circuit has understood Egan to preclude employment-discrimination claims challenging "an adverse employment action based on denial or revocation of a security clearance."  Ryan v. Reno, 168 F.3d 520, 524 (D.C. Cir. 1999); see Bennett v. Chertoff, 425 F.3d 999, 1003–04 (D.C. Cir. 2005).  The Court of Appeals has reasoned that such claims are ordinarily evaluated pursuant to the McDonnell Douglas burden-shifting framework, under which the second step requires "the defendant employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action."  Ryan, 168 F.3d at 523 (quoting Paquin v. Fed. Nat'l Mortg. Ass'n, 119 F.3d 23, 26 (D.C. Cir. 1997)).  When a claim stems from the denial or suspension of a security clearance, however, "a court cannot clear the second step of McDonnell Douglas without running smack up against Egan" because, when the employer's

proffered reason pertains to national security, the plaintiff cannot "challenge the proffered reason's authenticity without also challenging its validity." Id. at 524.  When a court "c[an]not proceed with the . . . discrimination action without reviewing the merits of [the] decision not to grant a clearance, the court [is] foreclosed from proceeding at all."  Id.

As a result, under Egan and its progeny, Brackett cannot challenge the suspension of her security clearance.  Indeed, she readily admits as much.  See ECF No. 72 (Pl. Opp.) at 16 ("Plaintiff is not seeking reversal of the Personal Security Division's temporary suspension of her clearance.").  Rather, she contends that her claims are justiciable because they fall within a carve-out to the Egan rule established in Rattigan v. Holder (Rattigan II), 689 F.3d 764 (D.C. Cir. 2012).  Rattigan II explained that "Egan's absolute bar on judicial review covers only security clearance-related decisions made by trained Security Division personnel and does not preclude all review of decisions by other FBI employees who merely report security concerns." Id. at 768.  The court then homed in on the question of whether Egan "bar[s] reporting and referral claims altogether" — i.e., claims that employees referred or reported security concerns about a colleague in a discriminatory or retaliatory manner.  Id. at 770.  It concluded that because "Title VII claims based on knowingly false reporting present no serious risk of chill[ing valid reports], we believe that claims of knowingly false security reports or referrals can coexist with Egan and the Executive Order" concerning security-clearance standards and protocols.  Id. "Under Rattigan II," then, "there can be liability for a security investigation referral only where 'agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false.'"  Rattigan v. Holder (Rattigan III), 780 F.3d 413, 416 (D.C. Cir. 2015) (quoting Rattigan II, 689 F.3d at 771).  In addition, "[m]otive and knowing falsity must unite in the same person."  Id.

With those principles in mind, the Court now examines Brackett's contention that her claims are justiciable under <u>Rattigan II</u>'s exception to <u>Egan</u>. Specifically, she maintains that they arise from knowingly false referrals made by her supervisors, Bennett and Singleton, who she submits harbored discriminatory and retaliatory motives. The Court considers the two supervisors separately.

### 1. *Bennett*

While the parties disagree about the particulars of Bennett's statements, at this stage "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in h[er] favor." <u>Liberty Lobby</u>, 477 U.S. at 255. Bennett's main statements at issue are those she made to Tyson in regard to Plaintiff's remote work in June 2014. According to Tyson, Bennett called him on May 8, 2015, stating that "she had an employee, Cindy, that she expected [*sic*] of timecard fraud." Tyson Depo. at 15; <u>id.</u> at 29 ("She just said that the — she had an employee that she believes is doing timecard fraud."). More specifically, Tyson explained that Bennett told him that she believed that Plaintiff had surreptitiously been on vacation and then falsified a timecard stating she had been working. <u>Id.</u> at 23, 29. By his account, Bennett stated, "[I]f [Brackett is] supposed to be on medical telework and she's traveling on vacation, it's a timecard issue." <u>Id.</u> at 23. "Bennett also told [Tyson] that Cindy Brackett had a doctor's note saying she was unable to travel into work or travel," but that "she was traveling, so she had made a misrepresentation." <u>Id.</u> at 19–21. Based on that call, Tyson contacted Rooney, Chief of FIID, which kickstarted the internal investigation that ultimately led to suspending Brackett's security clearance and pay. <u>Id.</u> at 7–10.

Viewed in the light most favorable to Plaintiff, a reasonable jury could conclude that those statements constituted a knowingly false report — specifically, the report that Brackett had

11

fraudulently stated that she was working when she in fact was out on unsanctioned vacation. Singleton's testimony, for instance, indicated that Bennett was aware that Plaintiff was in Tennessee on June 20–25 and had worked while there.  He explained that he knew that Brackett was in Tennessee, that he had "approve[d] this leave" "[a]t the direction of Ms. Bennett," and that "Ms. Bennett saw this and approved it."  Singleton Depo. at 54–56, 58.  Singleton also stated that he and Bennett "both . . . were aware that Cindy was doing some work during this time."  Id. at 70.  Email records, moreover, corroborate that Plaintiff and Bennett exchanged work emails during the dates in question.  See June 20–25 Emails at 13–15, 18, 21–26, 29–30, 49, 55, 57–58. Last, Bennett's own testimony tacitly suggests that she was aware that Plaintiff had been in Tennessee on those dates and was initially planning to use leave but ended up working while she was there.  See Bennett Depo. at 91–94.  Although Bennett expressly denied telling Tyson that Brackett had committed timecard fraud and elsewhere disputed that she had approved Plaintiff's working from Tennessee, id. at 62; FIID Report at 7, "it is the province of the jury to weigh the credibility of competing witnesses."  Rattigan II, 689 F.3d at 771 (quoting Kansas v. Ventris, 556 U.S. 586, 594 n.* (2009)).

There is also a further dispute of fact as to whether Bennett believed that Brackett was physically unable travel at all — as opposed to not being able to drive herself — as she allegedly told Tyson.  See Reasonable Accommodation Letter at 1 (letter to Bennett from Plaintiff's doctor stating merely that Brackett "is often unable to operate a motor vehicle").  At this stage, it suffices that a reasonable jury could find that Bennett made knowingly false referral statements about Plaintiff to Tyson.

Before turning to the second part of the Rattigan II framework, it is worth addressing two additional contentions FEMA raises about the initial inquiry.  First, it argues that the challenged

statements in this case are distinguishable from those in <u>Rattigan</u> because "here the report and referral was validated and the investigation found that Plaintiff engaged in misconduct leading to her suspension," whereas the report in <u>Rattigan</u> was ultimately deemed "unfounded."  ECF No. 79 (Def. Reply) at 8.  As multiple courts in this district have explained in rejecting this exact argument, however, "While it is true that Mr. Rattigan's security clearance was not revoked, the reasoning of <u>Rattigan I</u> and <u>II</u> was not in any way based on this fact."  <u>Clark v. Johnson</u>, 206 F. Supp. 3d 645, 654 n.6 (D.D.C. 2016) (quoting <u>Burns-Ramirez v. Napolitano</u>, 962 F. Supp. 2d 253, 257 (D.D.C. 2013)).  Second, the agency contends that any statements made during the FIID investigation may not be considered because they "were made as part of the investigation and certainly cannot be examined by a jury without second-guessing the trained security personnel's judgments."  Def. Reply at 14.  Because the Court relies solely on statements made by Bennett prior to the initiation of the FIID investigation in reaching its justiciability conclusion, however, it need not decide that issue.

Turning to the other half of the <u>Rattigan II</u> inquiry, a jury could similarly conclude that Bennett made the above statements with a retaliatory motive.  Just as in typical retaliation cases, in which courts may find retaliation based on the temporal proximity between protected activity and the materially adverse action in question, here the Court can infer a retaliatory motive based on the chronology of relevant events.  <u>Cf.</u> <u>Keys v. Donovan</u>, 37 F. Supp. 3d 368, 372 (D.D.C. 2014) (quoting <u>Mitchell v. Baldrige</u>, 759 F.2d 80, 86 (D.C. Cir. 1985)) ("To establish a causal connection between the protected activity and the [challenged employment action] — in the absence of direct evidence — a plaintiff may show 'that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity.'").  "Although 'neither the Supreme Court nor the [D.C. Circuit] has established a

bright-line three-month rule,' this Circuit has generally found that such a gap between the

protected activity and the adverse employment action negates the temporal proximity needed to

prove causation." Id. at 373 (quoting Hamilton v. Geithner, 666 F.3d 1344, 1357–58 (D.C. Cir.

2012)).

Here, the evidence demonstrates that Plaintiff and Bennett engaged in back-and-forth

email communications about the reasonable accommodation request in early May 2015,

culminating in Brackett's emailing her doctor's letter on May 7.  See Reasonable

Accommodation Request at 1–6; see also Solomon v. Vilsack, 763 F.3d 1, 15 (D.C. Cir. 2014)

("The act of requesting in good faith a reasonable accommodation is a protected activity

under . . . the Rehabilitation Act.").  The evidence similarly suggests that Bennett became aware

of Brackett's EEO complaint on April 21 of the same year.  See Bennett Depo. at 206–07; see

also Holcomb, 433 F.3d at 902 ("By filing a formal complaint of discrimination on January 19,

2000, Holcomb engaged in protected activity.").  While the Government has moved to strike

statements attributable to the EEO Counselor, see ECF No. 80, the Court is relying on Bennett's

own deposition here.  Throughout this Opinion, moreover, the Court does not rely on the

materials at issue in the Motion to Strike, and it therefore need not resolve that Motion.

The temporal proximity between Bennett's knowledge of Brackett's activities and her

allegedly false statements supports the inference that retaliation motivated her.  Indeed, viewed

in the light most favorable to Brackett, the evidence depicts a chronology in which Bennett

became aware of the EEO complaint in late April 2015, received Plaintiff's reasonable-

accommodation request on May 7, and then made the knowingly false referral statements the

very next day — notwithstanding the fact that the telework incident she was reporting had

occurred nearly a year earlier.  Although that timeline may be coincidental or driven by Arnold's

referral to Bennett, it is enough to allow a jury to decide whether Bennett "acted with a retaliatory or discriminatory motive in reporting or referring information that [she] knew to be false." Rattigan III, 780 F.3d at 416 (citation omitted).

       2. *Singleton*

The same cannot be said, however, with regard to Singleton. While the parties may dispute whether he made knowingly false reports or referrals within the meaning of Rattigan II, there is no evidence that he harbored a retaliatory or discriminatory motive. Singleton, recall, did not make the challenged statements until he was interviewed by Igo on September 16, 2015 — a fact that Brackett does not dispute. See FIID Report at 4 ("On September 16, 2015, FIID telephonically interviewed Regional, Threat, Controls Section Lead for IT Gerald Singleton."); Pl. Opp. at 21.

Given that timeline, the Court cannot rely on temporal proximity to conclude that Singleton acted with the requisite retaliatory motive to satisfy the second prong of the Rattigan II inquiry. Plaintiff engaged in protected activity in April and early May 2015, when she filed her EEO complaint and formally requested a reasonable accommodation, respectively. Yet Brackett points to no evidence in the record suggesting that Singleton knew about the reasonable-accommodation request. See Pl. Opp. at 25. She suggests only that he "learned about her EEO Complaint sometime in 2015." Id. Even if that vague reference were enough to satisfy the requirement "that the employer had knowledge of the employee's protected activity," Keys, 37 F. Supp. 3d at 372 (citation omitted), too much time elapsed between that protected activity and Singleton's statements nearly five months later to infer a retaliatory motive.

As courts have routinely "found that a three to four month gap between the protected activity and the [disputed] action is too great to establish an inference of causation," the Court

here follows suit and concludes that the interval between Brackett's protected activity and Singleton's statements cannot support a causal nexus between the two. See Mokhtar v. Kerry, 83 F. Supp. 3d 49, 81 (D.D.C. 2015), aff'd, No. 15-5137, 2015 WL 9309960 (D.C. Cir. Dec. 4, 2015) (citation omitted); see also Keys, 37 F. Supp. 3d at 373; Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) (citing with approval cases rejecting proximity of three and four months as evidence of causation).

Plaintiff has also not identified a discriminatory motive on the part of Singleton. Indeed, aside from asserting that he "was well-aware of Plaintiff's disability," Pl. Opp. at 25, she does not meaningfully contend that he harbored a discriminatory — as opposed to a retaliatory — motive. The Court also sees nothing evincing an invidious motive on his part, and it therefore concludes that any allegedly false reports he made do not fall within the Rattigan II exception.

B. Exhaustion

The Government next contends that, regardless of justiciability, Brackett failed to timely exhaust administrative remedies. "The Rehabilitation Act requires individuals to exhaust administrative remedies before they can file suit to enforce the Act's protections." Doak v. Johnson, 798 F.3d 1096, 1099 (D.C. Cir. 2015) (citing 29 U.S.C. § 794a(a)(1)). "For claims against federal agencies, exhaustion requires submitting a claim to the employing agency itself." Id. (citations omitted). The guidelines "governing administrative remedies for discrimination claims against federal agencies are set forth in EEOC regulations," id., including 29 C.F.R. § 1614.105(a)(1), which states that "[a]n aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." Here, Defendant maintains that

Brackett's failure to timely initiate contact with an EEO Counselor bars the Court from considering many of her claims.  See Def. MSJ at 38–41.

Regardless of whether FEMA is correct about Plaintiff's lack of timely compliance, its position cannot advance because the agency conceded in its Answer that "Plaintiff has exhausted her remedies as to the claims alleged in paragraph 46 of the Amended Complaint."  ECF No. 13 (Answer), ¶ 47.  "Because untimely exhaustion of administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving it."  Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997) (citing Brown v. Marsh, 777 F.2d 8, 13 (D.C. Cir. 1985)). Federal Rule of Civil Procedure 8(c), which governs affirmative defenses, states that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." The D.C. Circuit has therefore held that "[a] party's failure to plead an affirmative defense . . . generally 'results in the waiver of that defense and its exclusion from the case.'"  Harris v. Sec'y of the Dep't of Veterans Affairs, 126 F.3d 339, 343 (D.C. Cir. 1997) (quoting Dole v. Williams Enters., Inc., 876 F.2d 186, 189 (D.C. Cir. 1989)).  Indeed, the Court of Appeals has made clear that "Rule 8(c) means what it says: a party must first raise its affirmative defenses in a responsive pleading before it can raise them in a dispositive motion."  Id. at 345; see also Smith-Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998) ("[A]n affirmative defense not raised by answer cannot be raised in dispositive motions that are filed post-answer.").

In this case, not only did Defendant neglect to raise administrative exhaustion as an affirmative defense, it affirmatively waived the argument.  See Answer, ¶ 47; see also Harris, 126 F.3d at 343 n.2 (discussing difference between waiver and forfeiture); Walker v. England, 590 F. Supp. 2d 113, 135–36 & n.15 (D.D.C. 2008).  It is plain — as Brackett herself admits — that "Plaintiff is not making any other claims than those listed in paragraph 46" of her Second

Amended Complaint, see Pl. Opp. at 26, because that eleven-part paragraph encompasses the entirety of the actions she challenges.  See SAC, ¶ 46.  And while the waiver came in the Government's Answer to Brackett's First Amended Complaint, Defendant never responded to her Second Amended Complaint — the operative pleading in this case.  See Walker, 590 F. Supp. 2d at 135–36 (defendant agency waived administrative-exhaustion argument when it first failed to raise issue as affirmative defense and then "failed entirely to answer Walker's First or Second Amended Complaints").  In short, any argument relating to Brackett's non-compliance with certain administrative deadlines is waivable and was in fact waived in this case.  See Doak, 798 F.3d at 1104.

Defendant's arguments to the contrary do not alter the outcome.  While it never responds to Brackett's waiver contention and its briefing is not a model of clarity on this point, the agency at times suggests that failure to exhaust is a jurisdictional defect — in which case an exhaustion argument could not be waived.  See Def. MSJ at 36–37 & n.7 ("[F]ailure to exhaust administrative remedies is a jurisdictional defect, requiring dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1).") (quotation marks and citations omitted); Def. Reply at 3–7; but see Def. MSJ at 39 ("The exhaustion of administrative remedies is not a jurisdictional requirement of the statute.").  In any event, to the extent that FEMA contends that "timely administrative exhaustion is a jurisdictional requirement under the Rehabilitation Act," Doak, 798 F.3d at 1103, that position is foreclosed by Circuit precedent.

In Doak, the "district court read Spinelli v. Goss, 446 F.3d 159 (D.C. Cir. 2006), to hold that timely administrative exhaustion" under the Rehabilitation Act is jurisdictional, but the Court of Appeals reversed and expressly held that "Spinelli does not reach that far."  Id.  Doak explained:

In Spinelli, this court addressed the jurisdictional consequence of a plaintiff's wholesale failure to file an administrative complaint or to obtain any administrative decision at all.  This court held that federal court "jurisdiction depended on the final disposition of [an administrative] complaint."  446 F.3d at 162.  Because the plaintiff in Spinelli never filed an administrative complaint, there was never any final administrative disposition of a complaint, or any reviewable final administrative action at all.   Under those circumstances, Spinelli held that the court lacked jurisdiction over the plaintiff's claims.

That is all Spinelli held. In so ruling, the court did not attach irremediable jurisdictional consequence to every procedural misstep that happens during exhaustion of the administrative process. And certainly not for defaults that occur in the informal process created by EEOC regulation as a non-statutory step preceding the formal agency exhaustion required by statute. To the contrary, this court has ruled that "the administrative time limits created by the EEOC erect no jurisdictional bars to bringing suit." Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997).  Instead, those time limits "function[ ] like statutes of limitations," and thus "are subject to equitable tolling, estoppel, and waiver." Id.  While those cases involved claims under Title VII rather than the Rehabilitation Act, nothing in the Rehabilitation Act or the EEOC regulation warrants treating the same administrative time limit differently based on which claims are involved.

Spinelli thus does not bar jurisdiction here because Doak filed and received a final disposition of her administrative complaint. As this court has held, issues concerning how a claimant participates in that administrative process, both procedurally and substantively, are not of jurisdictional moment.

798 F.3d at 1103–04 (internal quotation marks and citations omitted).

Here — as in Doak, and unlike in Spinelli — Plaintiff initiated contact with an EEO Counselor and filed administrative complaints, and the only question is whether she did so in a timely fashion.  Brackett filed her first administrative complaint on May 1, 2015, and she received a Final Agency Decision on the matter on May 4, 2017.  See EEO FAD at 1–2, 17.  She also filed the second administrative complaint in January 2016, then waited the requisite 180 days with no action being taken before filing this lawsuit.  See EEO Procedural Dismissal at 1–3;

29 C.F.R. § 1614.407(b) ("A complainant who has filed an individual complaint . . . is

authorized under . . . the Rehabilitation Act . . . to file a civil action in an appropriate United

States District Court . . . [a]fter 180 days from the date of filing an individual or class complaint

if agency final action has not been taken.").  Brackett was thus "aggrieved by the final

disposition of [her] complaint, or by the failure to take final action on such complaint," 29

U.S.C. § 794a(a)(1), making clear that she complied with the lone jurisdictional requirement set

out in Spinelli.  See 446 F.3d at 162.  In sum, "[b]ecause the deadline for contacting an EEO

Counselor is not jurisdictional, [Brackett]'s failure to comply with it may be waived by the

agency. And that is what [FEMA] has done." Doak, 798 F.3d at 1104.

    C.  Adverse Action

    With the threshold issues in the rearview mirror, the Court can look ahead to Defendant's

sole merits argument.  It submits that eight out of the eleven incidents Brackett challenges do not

constitute adverse employment actions under the Rehabilitation Act.  See Def. MSJ at 43.  The

Court concurs only in part, concluding that while some of Plaintiff's claims are not cognizable,

many are.

    Brackett alleges that the actions taken by FEMA were both discriminatory and

retaliatory.  Of course, "[t]he standard for what constitutes an 'adverse employment action' is

lower with respect to a retaliation claim than with respect to a discrimination claim." Allen-

Brown v. D.C., 174 F. Supp. 3d 463, 481 n.13 (D.D.C. 2016) (citing Baird v. Gotbaum, 662 F.3d

1246, 1249 (D.C. Cir. 2011)).  "This distinction is irrelevant here," however, id., because the

differences in the standards are not of central importance under the circumstances of this case

and do not affect the Court's conclusions.  See Hornsby v. Watt, 217 F. Supp. 3d 58, 66 (D.D.C.

2016) (citations omitted) ("[W]hile the scope of actions covered by Title VII's substantive

provision and its anti-retaliation provisions differ, the magnitude of harm that plaintiff must suffer does not.").

In both contexts, "not everything that makes an employee unhappy is an actionable adverse action." Douglas v. Donovan, 559 F.3d 549, 552 (D.C. Cir. 2009) (internal quotation marks omitted).  With regard to discrimination claims, an "adverse employment action" is "a significant change in employment status."  Id. (internal quotation mark omitted).  To suffer an adverse employment action, the employee must "experience[ ] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002).  Thus, while "hiring, firing, failing to promote, [and] reassignment with significantly different responsibilities categorically are adverse employment actions," Douglas, 559 F.3d at 556 (internal quotation marks omitted), "[p]urely subjective injuries, such as dissatisfaction with a reassignment . . . or public humiliation or loss or reputation, . . . are not adverse actions."  Forkkio, 306 F.3d at 1130–31.  The question is not whether an employer has taken an action that makes "an employee unhappy," Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001), but rather whether the action resulted in a "significant" and "objectively tangible" harm.  Douglas, 559 F.3d at 552 (internal quotation marks omitted).

Meanwhile, "in the retaliation context," the term "encompass a broader sweep of actions than those in a pure discrimination claim."  Baloch v. Kempthorne, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008).  For a claim of retaliation, "an action is adverse if it would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Crowley v. Vilsack, 236 F. Supp. 3d 326, 330 (D.D.C. 2017) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).  The action must also be materially adverse so as "to separate

significant from trivial harms . . . such as the sporadic use of abusive language." Burlington N.,
548 U.S. at 68 (internal citations and quotation marks omitted).

   The Court first addresses the employment actions that it concludes are not adverse, before
turning to those claims that may proceed.  With respect to the former, consider Brackett's
allegation that "Bennett prevented Plaintiff from efficiently performing her job duties by
interfering, delaying or blocking her efforts to obtain a replacement laptop when her laptop
developed technical problems."  SAC, ¶ 46(b).  In Brackett's Opposition, she suggests that this
action goes toward the claim that FEMA "did not reasonably accommodate her."  Pl. Opp. at 44.
To the extent that she alleges that the action was discriminatory or retaliatory, however, the D.C.
Circuit has made clear that "[m]ere inconveniences and alteration of job responsibilities will not
rise to the level of adverse action."  Stewart v. Evans, 275 F.3d 1126, 1135 (D.C. Cir. 2002).
Because Plaintiff has neither alleged nor provided evidence indicating that the delay in obtaining
a replacement laptop affected her "job position, grade, pay, or benefits," the action is not
actionable under the law of the circuit.  Id.

   Similarly, Bennett's "inform[ing] Plaintiff that she would be performing cyber security
training, but only temporarily, until a GS-14 individual could be hired who would perform those
duties," also did not constitute an adverse action.  See SAC, ¶ 46(e).  "The D.C. Circuit has held
that minor changes in work-related duties or opportunities do not constitute an actionable injury
unless they are accompanied by some other adverse change in the terms, conditions or privileges
of employment."  Stewart, 275 F.3d at 1135; see also Baloch, 550 F.3d at 1196–97.  Here,
Plaintiff provides no reason to think that temporarily assigning her to perform certain job duties
until an individual of a similar level could take over came with materially adverse consequences
affecting the terms, conditions, or privileges of employment.

The remainder of the employment actions Brackett identifies may go forward.  With regard to the allegations that Defendant removed her budgetary duties, as well as her roles leading "Special Account Access; approving access to the HSDN; and approving access to the Office of Inspector General Virtual Private Network," SAC, ¶ 46(c)–(d), that is precisely the type of change in duties that "a reasonable juror could find . . . left the plaintiff with significantly diminished responsibilities." Czekalski, 475 F.3d at 365 (citation omitted).  Indeed, the D.C. Circuit has explained that "[a] drastic reduction in responsibilities is an 'objectively tangible harm' even where a plaintiff does not suffer a reduction in grade, pay, or benefits." Thomas v. Vilsack, 718 F. Supp. 2d 106, 122 (2010) (citing Holcomb, 433 F.3d at 902).  So, too, Brackett's allegation relating to Defendant's failure to place her on performance standards or to complete a final performance evaluation in 2015 also presents a jury question.  See SAC, ¶ 46(a).  "Taking all inferences in favor of [Brackett], there is a question of material fact as to whether . . . Defendant's failure to rate her in FY20[15] resulted in an economic harm." Saunders v. Mills, 172 F. Supp. 3d 74, 92 (D.D.C. 2016).  As in Saunders, Plaintiff has alleged that she "received . . . performance awards as a result of her ratings in" prior years,  but that she was ineligible to receive such compensation for the year in question "because she was never rated for the year." Id.; see Pl. Opp. at 43.  While the evidence adduced thus far indicates that Plaintiff "received a raise or step increase in or about June 2015," there remains a disputed material fact as to the source of that raise or whether a favorable performance evaluation would have led to a performance award for the full 2015 pay period.  See Pl. Resp. to Def. SMF at 26.

Brackett's claims relating to the suspension of her security clearance, position, and pay, as well as FEMA's decision not to reassign her to another position, may also proceed.  In fact, the agency does not deny that such suspensions, identified in paragraph 46(g) and (j)–(k) of the

Second Amended Complaint, are adverse.  See Def. MSJ at 43.  With respect to the allegations

relating to Bennett's and Singleton's allegedly false statements, Brackett's placement on

temporary paid leave, and Defendant's issuing her a Notice of Proposed Indefinite Suspension,

see SAC, ¶ 46(f), (h)–(i), those actions were part and parcel of the security-related employment

decisions previously addressed.  Because FEMA does not dispute that those ultimate actions

were adverse, the Court need not dwell on whether the short-lived, interlocutory steps taken by

Defendant that culminated in those actions themselves constituted adverse actions.  The import

of all those actions is that they resulted in the Government's suspending Brackett's clearance and

thus her position and pay, which all agree involve adverse employment actions.

      D.  Remaining Issues

      The Court could conclude the Opinion here, as Brackett's Complaint and briefing are far

from clear about the extent to which she also alleges a standalone claim for failure to reasonably

accommodate.  See SAC, ¶ 46 ("Defendant violated the Rehabilitation Act by failing to

reasonably accommodate her disability and by engaging in a pattern of discriminatory and

retaliatory harassment, discriminating and retaliating against her and committing a series of

adverse and materially adverse actions as indicated below . . ."); Pl. Opp. at 27 ("Defendant

moves to dismiss all eleven of Plaintiff's claims . . . .") (emphasis added); id. at 44 ("To be clear,

this is the only claim where Plaintiff is claiming that Bennett did not reasonably accommodate

her because without a working laptop, Plaintiff could not competently perform her duties in her

accommodated status.").  Out of an abundance of caution, however, the Court will briefly

address whether Plaintiff has made out (1) a viable reasonable-accommodation claim; and (2) a

hostile-work-environment claim, which is alleged in similarly cursory fashion.

"To prevail on a reasonable accommodation claim, a plaintiff must establish by a preponderance of the evidence that '(1) she was a qualified individual with a disability, (2) the [employer] had notice of her disability and (3) the [employer] denied her request for a reasonable accommodation.'" Waggel v. George Washington Univ., 957 F.3d 1364, 1371 (D.C. Cir. 2020) (alternations in original) (quoting Ward v. McDonald, 762 F.3d 24, 31 (D.C. Cir. 2014)).  As the plaintiff, Brackett "bears the burden of proving these elements." Ward, 762 F.3d at 31.  With regard to the third part of that burden, it is important to note that "[a]n underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has" in fact "requested an accommodation which the defendant-employer has denied." Waggel, 957 F.3d at 1372 (quoting Flemmings v. Howard Univ., 198 F.3d 857, 861 (D.C. Cir. 1999)).

While Brackett made an unequivocal request for a reasonable accommodation in spring 2015, she does not dispute that Defendant approved that request — which remains in effect — after engaging in "good faith" in an "interactive process." Ward, 762 F.3d at 32; see Pl. Resp. to Def. SMF at 8–9; Reasonable Accommodation Letter at 1.  Plaintiff, moreover, has not demonstrated that she made any other request for a reasonable accommodation that FEMA denied.  For instance, regardless of whether her earlier work-from-home arrangement constituted a reasonable accommodation or her "supervisors' discretionary approvals of telework," Def. MSJ at 4, Plaintiff does not deny that she was permitted to work from home prior to the approval of the formal accommodation request. See Pl. Resp. to Def. SMF at 4–7; Bennett Depo. at 133 (explaining that, despite supervising her for years, "I've never met with Cindy [Brackett]").

Brackett's further suggestion that FEMA's delay in providing her a replacement laptop constituted a denial of an accommodation request similarly does not hold water.  It is difficult to see how such a complaint, even coupled with an employer's knowledge of a disability, represents

25

a denied request to accommodate her disability.  After all, "[n]otice of a disability does not

ordinarily satisfy the . . . request requirement, which performs the independent function of

informing an employer of the limitations imposed by a disability and the nature of the

accommodation needed to remedy those limitations."  Waggel, 957 F.3d at 1372.  Here, Plaintiff

has not demonstrated that she made an actual request for a reasonable accommodation in

connection with her employer's alleged delay in providing her a replacement laptop.  See Austin

v. Washington Metro. Area Transit Auth., 2020 WL 2962609, at *8 (D.D.C. May 28, 2020)

(quoting Badwal v. Bd. of Trustees of Univ. of D.C., 139 F. Supp. 3d 295, 313 (D.D.C. 2015))

("An employer's 'obligation' to provide accommodations 'is only triggered where the employee

has actually requested a reasonable accommodation.'").

Last — and in a similar vein — it is unclear whether Plaintiff is bringing a separate

hostile-work-environment claim when she references Defendant's "engaging in a pattern of

discriminatory and retaliatory harassment."  SAC, ¶ 46.  Her briefing ignores the issue, and, in

any event, she has not made out a *prima facie* case.

The protections of antidiscrimination laws extend not just to "'economic' or 'tangible'

discrimination," but also "include[] requiring people to work in a discriminatorily hostile or

abusive environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor

Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)).  A hostile work environment arises when

a "workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is

'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment.'"  Harris, 510 U.S. at 21 (quoting Meritor Savings Bank, 477 U.S.

at 65, 67).  In assessing whether this standard is met, courts look to a variety of factors, including

"whether [the conduct] is physically threatening or humiliating, or a mere offensive utterance;[]

whether it unreasonably interferes with an employee's work performance," id. at 23, as well as whether there were circumstances a "reasonable . . . person would find hostile or abusive, and one that the victim in fact did perceive to be so."  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).

Although Brackett references a pattern of harassment in her Complaint, see SAC, ¶ 46, none of the challenged actions — viewed separately or together — suggests that her supervisors' or colleagues' behavior was "physically threatening or humiliating."  Rather, she alleges some employment actions that were adverse under the discrimination rubric and that she may present to a jury as such, and some actions that simply are not protected by the Rehabilitation Act.

## IV.    Conclusion

For the foregoing reasons, the Court will deny Defendant's Motion in part and grant it in part.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  December 2, 2021