**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CINDY BRACKETT, | |
| *Plaintiff,* | |
| v. | Civil Action No.: 17-cv-00988-JEB |
| JOHN F. KELLY, SECRETARY DEPARTMENT OF HOMELAND SECURITY, | |
| *Defendant.* | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR ATTORNEYS' FEES AND COSTS**

**INTRODUCTION**

After voluntary reductions made by Plaintiff's counsel, the attorneys' fees and costs represent nearly six-and-a-half years of work by Plaintiff's counsel. Plaintiff filed suit in this Court on May 24, 2017. Since then, the Defendant ("the Agency") has vigorously defended this case, relying primarily on the defenses that no discrimination occurred, that no adverse or material adverse action occurred, that the claims are barred by limitations and that six of the eleven claims are non-justiciable because they would require the Court to review the merits of a security decision. *See Dep't of Navy v. Egan*, 484 U.S. 518 (1988)[1] and *Rattigan v. Holder*, 689 F.3d 764 (D.C. Cir. 2012). Discovery commenced in December 2017 and was highly contentious and protracted, lasting nearly 3 years, during which Plaintiff's counsel took 15 depositions. The Defendant cannot vexatiously litigate and then complain about the resulting fees. *See City of Riverside v. Rivera*, 477 U.S. 561, 580 n. 11 (1986).

---

[1] Plaintiff will refer to this defense in subsequent discussions herein as the "*Egan* Defense."

Plaintiff was largely successful in opposing the motion, including defeating the contention that claims 6-11 were non-justiciable. Only after the Court's ruling on summary judgment, did the Agency, for the first time in this case, engage in serious settlement discussions. The discussions culminated in settlement for a lump sum of $150,000.00 as well as meaningful equitable relief, including a 2015 performance appraisal, restoration of leave, and expungement of records. In addition, Defendant agreed that Plaintiff is the prevailing party under the Rehabilitation Act and entitled to reasonable attorneys' fees and costs as determined by this Court.

The total fees sought, after exercise of billing judgment and voluntary categorical reductions, are $656,829.80. Plaintiff seeks fees at the current rates in the Legal Services Index Matrix ("LSI Matrix") for lead counsel Omar Vincent Melehy (nearly 37 years of experience) and associate Robert Porter (12-14 years of experience when he did the work on the case). These rates are appropriate given Mr. Melehy's and Mr. Porter's skill and experience and because this case qualifies as complex federal litigation. Plaintiff seeks fees at the rates in the government's USAO Fitzpatrick Matrix ("Fitzpatrick Matrix") for the other two attorneys who worked on this case – Andrew Balashov and Qiusi Yang – and the paralegals and law clerks for whom fees are sought. Plaintiff expects that the Agency will not challenge the fee requests that are based on the Fitzpatrick Matrix. *See* Fitzpatrick Matrix n3, Ex. H. Finally, Plaintiff seeks $39,668.96 in litigation costs.[2] Plaintiff relies upon the following documents which are attached hereto: Contemporaneous Billing Records of Melehy & Associates LLC, Ex. A; Decl. of Omar Vincent Melehy, Ex. B; Retainer Agreements, Ex. C; Decl. Of Robert "Bob" Seldon, Esquire, Ex. D; Decl. of Nicholas Woodfield, Esquire, Ex. E; LSI Laffey Matrix, Ex. F; Settlement Agreement, Ex. G;

---

[2] Plaintiff is filing, contemporaneously with this motion, a Bill of Costs pursuant to 28 U.S.C. § 1920. Plaintiff seeks herein any costs which are not taxed as well as other non-taxable costs which are typically included as part of an attorneys' fee award in this District.

Fitzpatrick Matrix, Ex. H; 2014 NLJ Survey, Ex. I; Wilson Decl., Ex. J; 2017 NLJ Survey, Ex. K;

Spreadsheet of Costs and Backups, Ex. L; Email to K. Adebonojo, Ex. M.

## STATEMENT OF THE CASE

This case was complex from the onset, as the discriminatory and retaliatory acts took place

over a two-year period beginning in the summer of 2014 and largely ending in July 2016, even

though the effects of the discriminatory acts continued into later years. Ultimately, Plaintiff

pursued a total of 11 claims[3] and she was successful on all but two minor claims (claims 2 and 5),

which were a very small and relatively insignificant part of the overall pattern of discrimination.

ECF No. 83 at 22.

This case spanned seven-plus years. It began at the administrative level, when Plaintiff

filed her initial informal EEO complaint on March 30, 2015. ECF No. 83 at 4. Plaintiff filed a

---

[3] Prior to summary judgement, the claims were as follows: (1) Bennett failed to place Plaintiff on performance standards and failed to complete her performance appraisal for calendar year 2015 (ECF No. 38-1 ¶ 46 (a)); (2) Beginning in August 2014, Bennett prevented Plaintiff from efficiently performing her job duties by interfering, delaying or blocking her efforts to obtain a replacement laptop when her laptop developed technical problems (*id*. ¶ 46 (b)); (3) In late November 2014, Bennett removed Plaintiff's budgetary duties and assigned them to two persons who did not have disabilities and who were not on full-time telework (*id*. ¶ 46 (c)); (4) In late January 2015, Bennett removed the following duties performed by Plaintiff: Lead for Special Account Access; approving access to the HSDN; and approving access to the Office of Inspector General Virtual Private Network (*id*. ¶ 46 (d)); (5) On February 3, 2015, Bennett informed Plaintiff that she would be performing cyber security training, but only temporarily, until a GS-14 individual could be hired who would perform those duties (*id*. ¶ 46 (e)); (6) Beginning on or about May 7 and/or 8, 2015 and continuing through October 2015, Bennett and/or Singleton, communicated knowingly false information/statements to the Agency's Personal Security Division (*id*. ¶ 46 (f)); (7) Said knowingly false statements caused the Office of the Chief Security Officer to suspend Plaintiff's security clearance on November 19, 2015 (*id*. ¶ 46 (g)); (8) On November 20, 2015, Bennett placed Plaintiff on paid administrative leave, relieving her of the one job duty she had (timekeeping) (*id*. ¶ 46 (h)); (9) On December 8, 2015, Bennett issued a Notice of Proposed Indefinite Suspension of Plaintiff (*id*. ¶ 46 (i)); (10) On March 22, 2016, the Agency (Adrian Gardner) issued a decision suspending Plaintiff without pay indefinitely (*id*. ¶ 46 (j)); and (11) On March 22, 2016, the Agency (Adrian Garner) decided not to reassign Plaintiff or change her duties so that she could remain employed without a clearance (*id*. ¶ 46 (k)).

second administrative complaint in December of 2015. Defendant issued a Final Agency Decision as to the first complaint on May 4, 2017, and it later issued a Procedural Dismissal of the second complaint. ECF No. 83 at 6. Plaintiff filed this lawsuit on May 24, 2017 and thereafter amended the Complaint twice, mainly to voluntarily dismiss claims. ECF No. 83 at 6.  On January 27, 2021, Defendant filed a motion to dismiss or for summary judgment. ECF Nos. 60 and 60-1. Plaintiff filed her opposition memorandum on May 25, 2021. ECF No. 65. The Court determined that the parties failed to follow the procedures in the local rules and directed them to re-file their summary judgment papers.  ECF No. 83 at 7. Defendant refiled its motion on June 28, 2021, and Plaintiff refiled her opposition memorandum and statement of material facts in dispute on July 20, 2021. ECF Nos. 70 and 72. On November 4, 2021, Defendant filed a motion to strike some of Plaintiff's exhibits which Plaintiff opposed. ECF Nos. 80 and 81. Then on December 2, 2021, this Court issued a decision denying summary judgment as to nine of Plaintiff's eleven claims and dismissing claims 2 and 5. It did not rule on the motion to strike. ECF No. 83.

The parties began the mediation process on or about December 13, 2021. ECF No. 84. On or about June 21, 2022, the parties reached a settlement regarding all matters in the case except for attorney's fees and litigation costs. ECF No. 94. The agreement provided the following to Plaintiff: (a) a lump sum payment of $150,000; (b) a 2015 performance appraisal with a numerical rating of 3.4; (c) removal from Plaintiff's Official Personnel file of any record of Plaintiff's placement on paid administrative leave or suspension without pay; (d) restoration of 150 hours of sick leave and 64 hours of annual leave; and (e) allowing her to file a motion for attorney's fees and costs, as determined by the Court. *See* Agreement, Ex. G.

**ARGUMENT**

The determination of reasonable attorney's fees in this Circuit is a three-part analysis: "[a] court must: (1) determine the number of hours reasonably expended in litigation; (2) set the reasonable hourly rate; and (3) use multipliers as warranted." *Salazar ex rel. Salazar v. District of Columbia*, 809 F.3d 58, 61 (D.C. Cir. 2015); *Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995).

**I.     THE COURT SHOULD AWARD FEES FOR LEAD COUNSEL OMAR MELEHY AND ASSOCIATE ROBERT PORTER AT LSI RATES**

The D.C. Circuit has held that the element regarding the reasonable hourly rate is itself comprised of three sub-elements: (1) the attorneys' billing practices, (2) the attorneys' skills, experience, and reputation and (3) the prevailing market rates in the relevant community. 809 F.3d 58, 61 (D.C. Cir. 2015); *Covington*, 57 F.3d at 1107 (1995). "[A] fee applicant bears the burden of establishing entitlement to an award . . . and justifying the reasonableness of the rates." *Id*. At that point, the claimed fee "is presumed to be the reasonable fee contemplated by" the statute, and the burden shifts to the defendant to present "equally specific countervailing evidence" if it seeks a different (presumably lower) rate. *Id*. at 1109 (internal quotation marks omitted).

In total, 5 attorneys worked on this case: (1) Omar Vincent Melehy (partner, 1986 law school graduate); (2) Robert Porter (associate, 2003 law school graduate); (3) Andrew Balashov (associate, 2015 law school graduate); (4) Qiusi Yang (associate, 2017 law school graduate); and (5) Jason Mansmann (associate, 2018 law school graduate). Ex. B ¶ 26. Plaintiff's counsel is not seeking fees for Mr. Mansmann's time. *Id*. A total of 5 law clerks and 5 paralegals worked on this case. *Id*. Plaintiff's counsel is only seeking fees for work done by 4 paralegals (Christopher Grau, Nicholas Blackmore, Sydney Chapman, and Emily Wilson) and is not seeking fees for paralegal Mirian Martinez's time. *Id*. Plaintiff's counsel is only seeking fees for work done by 3 law clerks

(Terence Scudieri, De'Yan Harris, and Qiusi Yang) and is not charging fees for work done by David Engstrom or Maiyun Lenguyen. *Id*. The "no charge" time appears in the billing records but has a value of "$0.00." *Id*. Plaintiff seeks the hourly rates in the current Fitzpatrick Matrix for Mr. Balashov (which ranged from $457 to $550 per hour) and Ms. Yang (which ranged from $440 to $457 per hour) and the 7 paralegals and law clerks who worked on this case ($207 per hour). The Agency cannot challenge Plaintiff's entitlement to these rates. *See* Ex. H at n3. Plaintiff seeks attorney's fees at the current LSI rates for Mr. Melehy ($997.00 per hour, the 20+-year bracket) and Robert Porter ($829 per hour, the 11-19-year bracket). Both Mr. Melehy and Mr. Porter were historically in the same respective brackets during the time they performed work on the case.

In this District, a successful plaintiff can establish their entitlement to LSI Rates by: (1) proving the case "falls within the bounds of complex federal litigation"; or (2) demonstrating that attorneys who handle similar cases in this locality receive fees at LSI Rates. *EDF v. United States EPA*, No. 17-cv-02220 (APM), 2022 U.S. Dist. LEXIS 7327, at *23 (D.D.C. 2022). Plaintiff relies on both methods. First, this case spanned nearly 7 years, two years at the administrative level and five years at the district court level. Namely, issues related to *Dep't of Navy v. Egan*, since several of the adverse or materially adverse actions stemmed from the suspension of Plaintiff's security clearance. Moreover, the Parties engaged in nearly 3 years of contentious discovery with numerous disputes which often required briefing, oral argument, and ultimately resolution by the Court. Plaintiff successfully navigated these challenging issues, largely defeated the Agency's motion for summary judgment and settled the case before trial for a generous amount and specific relief. Thus, the case qualifies as complex federal litigation which justifies use of current LSI Rates for Mr. Melehy and Mr. Porter. LSI Rates also most accurately reflect the prevailing market rates for attorneys in the District of Columbia who are engaged in

complex federal litigation before this Court and have the skill, reputation, and experience of Mr.

Melehy and Mr. Porter.

## A. THE DC CIRCUIT AND DISTRICT OF COLUMBIA TRIAL COURTS HAVE REPEATEDLY FOUND THAT THE LSI MATRIX REFLECTS PREVAILING MARKET RATES FOR COMPLEX FEDERAL LITIGATION IN THE DISTRICT OF COLUMBIA.

In *Blum v. Stenson*, the Supreme Court held:

The statute and legislative history establish that "reasonable fees" under [42 U.S.C. § 1988] are to be calculated according to the *prevailing market* rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel.

[T]he requested rates[must be] in line with those prevailing *in the community for similar services by lawyers of reasonably comparable skill, experience and reputation*. A rate determined in this way is normally deemed to be reasonable, and is referred to – for convenience – as the prevailing market rate.

465 U.S. 886, 895 (1984) (emphasis supplied). This Court is tasked with fixing the prevailing

hourly rate with a "fair degree of accuracy." *Thomas v. Moreland*, Civil Action No. 18-cv-0800

(TJK/RMM), 2022 U.S. Dist. LEXIS 108111, at *7 (D.D.C. 2022). To do so, it may rely on

affidavits of Plaintiff's counsel, supporting affidavits from other practitioners in the relevant field,

fee awards in other cases, billing surveys, and the LSI Matrix itself. *Id.*; *see also WP Co. LLC v.

United States SBA*, 514 F. Supp. 3d 267, 275 (D.D.C. 2021).

The D.C. Circuit has indicated that, in some instances, the LSI matrixit is a better measure

of market rates for complex federal litigation than the USAO Matrix. In *Salazar v. District of

Columbia*, the Court upheld the trial court's award of LSI rates where the petitioners presented

sufficient evidence that LSI rates were market. 809 F.3d 58, 65 (2015). The *Salazar* plaintiffs

relied on an affidavit from Dr. Kavanaugh (developer of the LSI Matrix), billing tables

demonstrating that the average billing rates at national law firms were 14% higher LSI Rates and

38% higher than the USAO Matrix rates which the Court observed in a 2012 National Law Journal

Survey showing partner rates for the Washington D.C. market "far exceeded" the LSI rates. *Id*.

Then in *DL v. District of Columbia*, the Court held that the LSI Laffey Matrix best approximates the "prevailing market rates for complex federal litigation" in the D.C. market. 924 F.3d 585, 595 (D.C. Cir. 2019). The *DL* Court recognized that the LSI Matrix was more accurate than the then current USAO Matrix because the LSI Matrix relies upon a "statistically significant sample size" and "more narrowly defined experience categories." *Id*. at 591. And, the *DL* Court recognized that LSI rates may be a "conservative estimate of the actual cost of legal services in the [D.C.] area." *Id*.

Moreover, this Court has, on multiple occasions, before and after the *DL* decision, concluded that LSI Rates reflected the prevailing market rates in this jurisdiction. [4] More recently, in *Thomas v. Moreland*, a single-plaintiff defamation action, Judge Kelly awarded LSI rates as sanctions. Civil Action No. 18-800 (TJK), 2022 U.S. Dist. LEXIS 107187, at *1 (D.D.C. 2022). Relying on the D.C. Circuit's holding in *DL*, Judge Kelly agreed with Magistrate Judge Meriweather's award of the LSI rates because they were prevailing market rates. *Id*. Similarly in *B.J. v. District of Columbia*, a single-plaintiff IDEA case, Judge Chutkan approved Magistrate Judge Faruqui's "Report and Recommendations" applying LSI rates where the petitioner submitted affidavits from four experienced IDEA litigators (two of whom were attorneys in the case and two who were not), who attested to receiving awards at LSI rates in similar cases. Civil

---

[4] Plaintiff is aware of a recent decision by this Court declining to award LSI rates in a Freedom of Information Act case, but this matter is easily distinguishable. Specifically, in *WP Co. LLC v. SBA*, this Court denied petitioner's request for LSI rates due to a "failure of proof." 514 F. Supp. 3d 267, 275 (D.D.C. 2021). The Court was right, as the plaintiffs in that case relied solely on the Matrix itself and a lone affidavit from their own counsel. *See* Case No. 1:20-cv-01240, ECF No. 27. Plaintiff's evidence is this case is far more extensive and compelling.

Action No. 19-cv-2163-TSC-ZMF, 2020 U.S. Dist. LEXIS 249956, at *8 (D.D.C. 2020). The *B.J.*

Court also relied upon other IDEA cases where LSI rates were awarded. *Id*. Chief Judge Howell

found LSI rates were market rates in *U.F. v. District of Columbia* based on a declaration from Dr.

Kavanaugh and evidence of recent fee awards using LSI rates, which she found "highly probative."

Civil Action No. 19-2164 (BAH), 2020 U.S. Dist. LEXIS 144694, at *15 (D.D.C. 2020). *See also*

*Mattachine Soc'y of Wash. v. United States DOJ*, 406 F. Supp. 3d 64, 71 (D.D.C. 2019) (holding

that in the wake of the *DL* decision, the Court could not apply the USAO matrix and it awarded

LSI rates instead).[5]

## B.   MR. MELEHY'S AND MR. PORTER'S SKILL, KNOWLEDGE, AND REPUTATION WARRANT USE OF LSI RATES.

The experience, skill, knowledge and reputation in the field of employment law of Mr.

Melehy and associate attorney Robert Porter, support their entitlement to LSI rates. Mr. Melehy is

a seasoned litigator with approximately 37 years of experience, including 25 years of experience

in private practice representing employees who have been the victims of discrimination and

retaliation. Ex. B ¶¶ 1-16. Mr. Melehy has tried a total of 20 cases to juries; has been lead counsel

---

[5] Even before *DL*, trial courts in this District awarded LSI rates. Including in Title VII cases. In *Makray v. Perez*, the plaintiff alleged her employer discriminated against her based on her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., 159 F. Supp. 3d 25, 27 (D.D.C. 2016). The jury awarded her damages of $200,000.00 for her non-selection claim. *Id*. In awarding attorneys' fees to Seldon & Bofinger (plaintiff's counsel), Chief Judge Howell applied the then current LSI rates, finding they most closely approached the prevailing market rates in the District of Columbia for practitioners handling similar cases. *Id*. at 39. *See also Hernandez v. Chipotle Mexican Grill,* Inc., 257 F. Supp. 3d 100, 102 (D.D.C. 2017) (another Title VII case where LSI rates were awarded); *Young v. Sarles*, 197 F.Supp.3d 38, 40 (D.D.C. 2016) (awarding LSI rates in a single-plaintiff first amendment case); *Citizens for Responsibility & Ethics in v. United States DOJ*, Civil Action No. 11-1021 (JEB), 2014 U.S. Dist. LEXIS 182097, at *25 (D.D.C. 2014) (awarding LSI rates as market rates in FOIA litigation); *Ricks v. Barnes*, No. 05-1756 (HHK), 2008 U.S. Dist. LEXIS 125469 (D.D.C. May 12, 2008) (*see* ECF No. 35, Report and Recommendation on fee petition, and ECF No. 51, order adopting Report and Recommendation; *Smith v. District of Columbia*, No. 00-894 (GK), 2006 U.S. Dist. LEXIS 91994 (D.D.C. Dec. 18, 2006) (*see* ECF No. 277).

in 40 bench trials in state and federal court; has been lead counsel in over 100 cases in federal court; has tried 15 cases before the Merit Systems Protection Board ("MSPB") and 14 before the EEOC; has served as lead counsel for approximately 35 cases before the EEOC; and has been lead counsel in approximately 30 appeals in state and federal court. *Id*. ¶¶ 9-15.

Mr. Melehy has achieved an "AV" rating – the highest rating available – from Martindale-Hubbell. *Id*. ¶ 16. This AV rating is directly related to his reputation as a highly skilled litigator because attorneys and judges provide the reviews that form the basis of the AV rating. *Id*. ¶¶ 7-16. Mr. Melehy is also active in employment law associations. He presently serves as the President of the Metropolitan Washington Employment Lawyers Association and is on the Board of Directors of the Washington Lawyer's Committee for Civil Rights and Urban Affairs. *Id*. ¶ 8.

Plaintiff relies upon two declarations, that of Robert "Bob" Seldon, Esquire (Ex. D) and that of Nicholas Woodfield, Esquire (Ex. E).

Plaintiff seeks to qualify Mr. Seldon as an expert for the purpose of this motion. Rule 702 of the Federal Rules of Evidence specifies the standards for an expert's qualification and the admissibility of an expert's opinion testimony. Expert testimony is admissible when it is the product of reliable principles and methods, and the expert witness has applied these principles and methods reliably to the facts of the case. Rule 702(2), (3), Fed. R. Evid. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 146 (1999); *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 594-95 (1993); *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996). The twin requirements for the admissibility of expert witness testimony are that it must be both relevant and reliable. *See Daubert*, 509 U.S. at 594-95; *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C.Cir.1996); *United States v. Libby*, 461 F.Supp.2d 3, 5-7 (D.D.C. 2006). When it is, expert opinion is admissible if it will assist the trier of fact in understanding or determining an issue. *See Burkhart v. WMATA*, 112

F.3d 1207, 1211 (D.C. Cir. 1997); *Ambrosini*, 101 F.3d at 133 (citing *Daubert*, 509 U.S. at 591) (citations omitted). Rule 702 specifies that an expert's qualifications may be based on "knowledge, skill, experience, training, or education," and not just a formal degree. *Burkhart*, 112 F.3d 1207, 1211 (D.C. Cir. 1997). An expert's employment in a certain field is one way for him to gain specialized knowledge for him to be qualified. *See Groobert v. Pres. & Dirs. of Georgetown College*, 219 F.Supp.2d 1, 11 (D.D.C. 2002) (citing *Kumho Tire*, 526 U.S. at 149); *Lohrenz v. Donnelly*, 223 F.Supp.2d 25, 35-36 (D.D.C. 2002) (an expert may be qualified based on "intense practical experience" in a particular field).

Mr. Seldon's testimony is relevant because it goes to the issue of whether the rates sought for Mr. Melehy and Mr. Porter are consistent with prevailing market rates. Ex. D. He also opines on what the prevailing market rates in this District are for an attorney with Mr. Melehy's skill, knowledge and experience, and finally he renders an opinion on the methodology used by Dr. Fitzpatrick in coming up with the Fitzpatrick Matrix (which Defendant is expected to argue should be applied) and whether that methodology yielded reliable and accurate results. *Id*. Mr. Seldon's opinion is also reliable because of his knowledge and experience.

Mr. Seldon is the founder of Seldon Bofinger & Associates, a top tier law firm providing representation to employees in cases arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*.; the Americans with Disabilities Act, 42 U.S.C. § 12112 and its analogue the Rehabilitation Act, 29 U.S.C. § 794a(a)(1). Ex. D ¶ 1. Prior to starting Seldon Bofinger in 2003, Mr. Seldon worked in the Civil Division of the U.S. Attorney's Office, where he represented the federal government in defense of some of the largest disputed and negotiated attorneys' fee awards at that time. *Id*. ¶¶ 4-7. He has extensive experience in appellate and trial practice, in federal, state, and local courts around the country and before federal administrative

agencies. *Id*. ¶¶ 14-18. He has gained considerable expertise in the law which applies to applications for awards of attorneys' fees and costs under a variety of fee-shifting statutes. *Id*. ¶ 6. Mr. Seldon also obtained an award of attorneys' fees at LSI rates in *Makray v. Perez*, 159 F.Supp.3d 25 (D.D.C. 2016), the first case in this jurisdiction awarding attorneys' fees in a single plaintiff employment case using the *LSI* rates. *Id*. ¶ 8. Mr. Seldon's knowledge, skill, training, and experience qualify him to testify as an expert on the prevailing market rates in this District. Accordingly, Mr. Seldon's opinion is reliable and will assist the trier of fact with understanding this issue.

Mr. Seldon opines that the LSI rate of $997 sought by Mr. Melehy is below the prevailing market rate for an attorney of Mr. Melehy's caliber practicing employment law litigation in the District of Columbia. Ex. D ¶ 67. Mr. Seldon notes that Mr. Melehy is a skilled litigator who zealously and artfully advocates for his clients. *Id*. ¶¶ 41-61 (discussing representative cases he has handled). Mr. Seldon points to Mr. Melehy's impressive victories in *Saunders v. Mills*, Civ. Action No. 11-0486 (RMC), a discrimination and retaliation case against the Small Business Administration where Mr. Melehy obtained a favorable jury verdict as to some claims after a 6-week trial, (*id*. ¶¶ 42-43) and *Perez v. Calderon Construction, Inc*., Civ. Action No. 12-0697 (BAH), a factually and legally complex case, in which Mr. Melehy successfully represented 13 plaintiffs who had not been paid all their wages in a bench trial. *Id*. ¶¶ 59-60. Mr. Seldon also recognizes the significance of Mr. Melehy's achievement in this case, in overcoming the Agency's summary judgment motion on the *Egan* defense. *Id*. ¶¶ 51-56. The *Egan* decision "essentially put all employment decisions that touched on national security and security clearances off limits in employment litigation." *Id*. ¶ 52. Yet, Mr. Melehy was able to establish a dispute of fact about whether the *Rattigan* exception applied, a "daunting task." *Id*. ¶ 54.

Mr. Seldon also analyzed billing-rate surveys from the National Law Journal for 2014 and 2017 and confirmed that the data supports Mr. Melehy's entitlement to an hourly rate of $997. *Id.* ¶ 64. In fact, Mr. Melehy's rate - $997 per hour – is approximately 24% lower than the high-end partner rate in the 2014 survey, after application of the Legal Services Component of the Consumer Price Index (hereinafter, the "Adjustment Factor") to bring it to current value.[6] *Id.* ¶¶ 66-67. Specifically, the data in the 2014 Survey shows that the average low-end billing rate for a partner is $721.25 and the average high-end billing rate for a partner is $1,304.09. *Id.* ¶ 66. The 2017 National Law Journal survey also supports the rate Mr. Melehy is seeking for himself. That survey included three Washington D.C. firms. *Id.* ¶ 68. After adjustment using the LSI, the average partner billing rate is $1,028.49. *Id.* In Mr. Seldon's experience, it is reasonable that Mr. Melehy's rate would be higher than the average partner rate since he has 20-plus years of experience, more than some partners at those firms. *Id.* 67. These rates are equally indicative of reasonable rates for specialized small firms, such as Melehy & Associates LLC. *Id.*

Mr. Woodfield is a principal at The Employment Law Group, a Washington D.C.-based employment litigation firm. Ex. E ¶ 1. He was admitted to practice in the District of Columbia in 2002. *Id.* ¶ 3. Mr. Woodfield has direct experience with statutory fee-shifting litigation and knowledge regarding the current market rates for employment litigation attorneys in the District of Columbia. *Id.* ¶ 5. He has acquired this knowledge through litigating his own cases, reading the fee petitions of other attorneys, by participating in seminars on the subject, reading judicial

---

[6] Mr. Seldon and Plaintiff used the Legal Services Component of the Consumer Price Index, hereinafter, the "Adjustment Factor," to update hourly rates in the surveys he analyzed, and the rates charged by other attorneys' in past years to account for inflation or rates identified in older billing-rate surveys. Ex. D ¶ 66; Wilson Decl. ¶¶ 4-8, Ex. J.

13

decision on the subject from judges in this District, reading other fee applications from other attorneys in this District, and speaking to other practitioners. *Id*. He and his law firm have also obtained fees at LSI rates in employment and disability discrimination cases. *Id*. ¶ 10.

Mr. Woodfield is familiar with Mr. Melehy and Melehy & Associates LLC and can attest that the firm has a deservedly excellent reputation in the employment-law community. *Id*. ¶ 9-11. According to Mr. Woodfield, Mr. Melehy has a reputation for providing skilled legal services to employees in the Washington, D.C. Metro area and can command the rates set forth in the LSI *Laffey* Matrix. *Id*. ¶ 12. Mr. Woodfield opines that the LSI rates are reflective of the prevailing market rates in this District and that Mr. Melehy and Robert Porter, who worked under his tutelage on this case, are deserving of these rates as requested. *Id*. ¶¶ 8-12.

Mr. Porter is, in fact, deserving of the LSI rate of $829 per hour given his skill and experience. Ex. B ¶¶ 18-20; Ex. E ¶¶ 8-12. Mr. Porter worked as an associate at Melehy & Associates LLC from March 2013 to November 2017 and worked almost exclusively on Plaintiffs' discrimination and wage and hour cases.  Ex. B ¶ 18. Mr. Porter graduated from the University of Chicago Law School in June 2003. *Id*. ¶ 19. After graduation, Mr. Porter was employed by a small firm in Washington, D.C. where he handled general civil litigation. *Id*. He clerked for a judge on the Virginia Court of Appeals from August 2005 to August 2008, during which time he conducted research and drafted opinions. *Id*. After he left the clerkship, he worked on several pro-bono employment cases through the DC Employment Justice Center. *Id*. He is a member of the state and federal bars in Maryland, the District of Columbia, and Virginia (Eastern District). *Id*.

As Mr. Melehy explains in this declaration, Mr. Porter was an extremely talented legal writer and he played a key role in the firm's victory in *Garcia v. Skanska USA Bldg*., Inc., 324 F.Supp.3d 76 (D.D.C. 2018). *Id*. ¶ 20. There Plaintiffs sued their employer and a general contractor

for failing to pay them wages in accordance with the Davis Bacon Act ("DBA") wage scale. *Id*. The Defendants moved to dismiss, claiming that the lawsuit was an inappropriate end-run around the administrative remedies of the DBA and non-justiciable. *Id*. Mr. Porter convinced this Court in *Skanska* to reject Second Circuit precedent as well as two-precedent setting cases decided by this Court dismissing DBA claims as an end run around the DBA administrative procedures (*Johnson v. Prospect Waterproofing Co.*, 813 F. Supp. 2d 4, 8-9 (D.D.C. 2011); *Ibrahim v. Mid-Atl. Air of DC, LLC*, 802 F. Supp. 2d 73, 76 (D.D.C. 2011)). *Id*. at 82-84 & n.4. Based on Mr. Porter's well-crafted arguments and analysis, the Court concluded that the DBA did not foreclose the Plaintiffs' claims. This is one of many examples of Mr. Porter's strong analytical skills and high level of knowledge and skill as an advocate. *Id*.

Therefore, Mr. Porter and Mr. Melehy had the knowledge, skill and experience to command LSI rates.

### C.   THE RATES IN THE LSI MATRIX FOR MR. MELEHY AND MR. PORTER ARE CONSISTENT WITH RATES FROM OTHER DISTRICT OF COLUMBIA LAW FIRMS

Motions for attorney's fees in other cases also demonstrate that LSI Rates sought by Mr. Melehy and Mr. Porter are at or below the market rates charged by practitioners engaged in complex federal litigation in the District of Columbia. In *Ray v. CLH New York Ave. LLC, et al.*, Case No. 19-cv-2841 (RCL) a single-plaintiff defamation case in this Court, Defendants (represented by Venable LLP) sought attorneys' fees after the Court granted their Rule 37 sanctions motion. *Id*. (*see* ECF No. 121, 121-5, 121-6, 121-7, 121-9, Declaration of Brian Schwalb and supporting documents; ECF No. 137, Order on motion for attorney's fees and costs). The 2021 hourly rate sought by Venable LLP ("Venable") for partner Brian Schwalb (who had 28 years of experience in 2021), after the LSI adjustment factor is applied, is $1,144.77, nearly $150.00 greater

than Mr. Melehy's LSI rate. Ex. J ¶ 11. Mr. Melehy is entitled to a higher market rate than Mr. Schwalb's $1,144.77 per hour because Mr. Melehy has 6 more years of experience. Ex. B ¶¶ 1-16.

In *In re Creative Hairdressers Inc., et al*., Case Nos. 20-14583, 20-14584 (jointly administered), a Chapter 11 bankruptcy case pending in the Maryland bankruptcy court, the Debtors hired the Washington D.C. law firm of Littler Mendelson P.C. ("Littler") as special employment counsel. *See* ECF Nos. 483, 778. Littler sought attorneys' fees in 2020 and in its petition indicated that its standard hourly billing rate for Steven Friedman, a partner with 35 years of experience, was $930.00. *See* ECF No. 483 at 5. Mr. Friedman's rate, if adjusted using the LSI, is $1,015.00, is higher than Mr. Melehy's requested rate of $997. Ex. J ¶ 10; Ex. B ¶ 2.

For associate attorney Robert Porter, who had between 12-14 years of experience when he performed work on this case, his LSI rate of $829 is below market when you compare it with the rates billed by other associates of comparable experience. Fee data from the case *Moore v. Chertoff*, a 10-plaintiff Title VII case, Case No. 1-00-cv-00953-PLF, is illustrative. In that case, Plaintiffs' counsel, the District of Columbia-based firm of Relman Colfax PLLC, petitioned for attorneys' fees in 2017. Ex. J ¶ 9. Megan Moran-Gates, an associate who then had 12 years of experience, sought fees at the rate of $700.00 per hour. *Id*. If the LSI Adjustment Factor is applied to her rate, her rate would be $844.80 per hour. *Id*.  Mr. Porter's rate of $829 per hour is less than Ms. Moran-Gates' rate even though Mr. Porter had more experience (between 12-14 years). *Id*. Thus, Mr. Porter's LSI rates is below the actual prevailing market rate.

### D.    THE LSI MATRIX IS A MORE ACCURATE REPRESENTION OF PREVAILING MARKET RATES THAN THE FITZPATRICK MATRIX.

The LSI Matrix itself is also evidence of the prevailing market rates in the District of Columbia and far more reliable than the flawed Fitzpatrick Matrix. The LSI Matrix is based on a representative sample of the cost of legal services from 1989, which is then adjusted annually using

the Department of Labor's Legal Services Index, which is a component of the Consumer Price Index. *See Citizens for Responsibility & Ethics in v. United States DOJ*, Civil Action No. 11-1021 (JEB), 2014 U.S. Dist. LEXIS 182097, at *22-23 (D.D.C. 2014). The methodology used to arrive at the current LSI Rates is far more accurate and reliable than the methodology used by the U.S. Department of Justice to arrive at the "Fitzpatrick Matrix." Ex. D ¶¶ 70-86. In Mr. Seldon's opinion, the prime assumption underlying the Fitzpatrick matrix, *i.e.* that it is a proxy for a determination of all attorneys' hourly rates based on their skill, experience and reputation in the legal community, is deeply flawed. *Id.* ¶ 3. The use of this assumption causes the reasonable hourly rates of highly qualified, experienced attorneys like Mr. Melehy to be artificially low, as data underlying the Fitzpatrick matrix shows. *Id.* It winds up with the anomalous result of setting the hourly rates of Mr. Melehy and similarly situated attorneys the same as the least capable, most inexperienced attorney who practices in the field of employment law. *Id.*

Mr. Seldon analyzed Dr. Fitzpatrick's data and methodology and came to several conclusions about its' flaws. First, Dr. Fitzpatrick arbitrarily excluded certain fee-decisions from his final list of 86 cases, including two cases where the Court awarded fees based on the LSI Matrix – *Makray v. Perez and Hernandez v. Chipotle Mexican Grill*. *Id.* ¶¶ 71-72. This flawed methodology results in an under-inclusive data set that would lead to the opposite result than what Dr. Fitzpatrick contends is the purpose of a fee-shifting statute – by drawing lower quality attorneys to employment cases in the hopes of getting a fee award at rates far greater than what they would ever hope to get on the open market. *Id.* ¶¶ 74-75. Meanwhile, skilled successful practitioners like Mr. Melehy are driven out because every employment case they handled would come with an opportunity cost of foregoing higher paid work. *Id.* ¶ 76. Moreover, Dr. Fitzpatrick's formula is not a reliable measure of the legal market and the text he relied upon is not a study

devoted to the legal market. *Id*. ¶ 77. The Defendant also refused to provide all the underlying data relied upon by Dr. Fitzpatrick, including any assumptions that he made or any summaries he may have reviewed, after Plaintiff formally requested they supplement their discovery responses to provide it (*see* Email, Ex. M). Thus, there is no way to determine with certainty whether his methodology produced reliable results. *Id*. ¶ 78.

Mr. Seldon, however, was able to find evidence of Mr. Melehy's true market rate using Dr. Fitzpatrick's data. One of the cases relied on by Dr. Fitzpatrick is *Moore v. Johnson*, Civ. Action No. 00-0953 (PLF). *Id*. ¶ 81. Mr. Seldon is familiar with the plaintiff's firm in that case - Relman, Dane & Colfax and two of their attorneys who worked on the case – Jennifer Klar and John Relman. *Id*. Dr. Fitzpatrick included *Moore* in his sub-set of cases, which means Ms. Klar's and Mr. Relman's rates reflect prevailing market rates. *Id*. Ms. Klar's work in *Caudle* began no later than 2012. *Id*. ¶ 82. At the time, Ms. Klar had nine years of experience and her hourly rate was $564.00. *Id*. Using the LSI-inflation factor that Dr. Fitzpatrick also uses to bring the rates current, Ms. Klar's hourly rate is $765.00, which is above Mr. Melehy's Fitzpatrick rate. *Id*. But this makes no sense, because Mr. Melehy has 37 years of experience, much more than Ms Klar. *Id*. In *Moore*, in 2017, Mr. Relman's rate was $1,151.00, and he had 34 years of experience then, much closer to Mr. Melehy's experience. *Id*. ¶ 83. Adjusting Mr. Relman's historical rate to current value using the LSI-inflation factor would make his rate $1,328.00[7]. Mr. Melehy is seeking an award based on an hourly rate of $997.00 per hour, which is far less. *Id*. ¶ 84. Thus, Mr. Seldon's opinion that Mr. Melehy's market rate is at least $997 per hour is supported by this data. *Id*.

E.     **LSI RATES ARE APPROPRIATE BECAUSE THIS CASE QUALIFIES AS COMPLEX FEDERAL LITIGATION**

---

[7] Rounded to the nearest dollar. *See* Ex. D ¶¶ 85-86.

An award of attorneys' fees using LSI Rates is also appropriate because this case qualifies as "complex federal litigation." *See DL*, 924 F.3d at 594. Many of the factors that courts in this District have found make a case complex, are present in this case, including the length of the litigation, the complexity of legal issues and the protracted nature of discovery. *See Feld v. Fireman's Fund Ins. Co.*, No. 12-1789 (JDB), 2020 U.S. Dist. LEXIS 39763, at *45 (D.D.C. 2020). First, this case has been pending for more than 7 years. Second, the discovery period was long, lasting almost 3 years, and it was contentious. Notably, Plaintiff was forced to request a discovery conference 9 different times to resolve discovery disputes that arose. *See* ECF Nos. 21, 26, 29, 32, 37, 42, 45, 47, 54. Several of these requests resulted in hearings before the Court on: 06/19/2018, 09/14/2018, 07/14/2020, 09/8/2020, and 04/30/2020. Ex. B ¶ 33.  The scope of discovery was also expansive. Plaintiff deposed 15 witnesses (and was deposed herself), including both responsible management officials, numerous co-workers and supervisors, and the 3 individuals who conducted Plaintiff's security clearance investigation. *Id.* ¶ 34. Plaintiff's Counsel also reviewed approximately 8,200 pages of documents produced by the Agency and produced nearly 1,000 pages of her own documents in response to the Agency's requests. *Id.* ¶ 35. Moreover, the presence of a complex legal issue (like the *Egan* defense) is also a hallmark of complex federal litigation. *See Lloyd v. Ingenuity Prep Pub. Charter Sch.*, No. 1:18-cv-00801 (TNM/GMH), 2020 U.S. Dist. LEXIS 220145, at *23 (D.D.C. 2020). Accordingly, this case qualifies as complex federal litigation.

## F.    THE FIRM QUALIFIES FOR LSI RATES BECAUSE IT REGULARLY DISCOUNTS ITS RATES.

The prevailing market rate method used in awarding fees to for-profit firms and public interest legal services organizations applies to a smaller firm like Melehy & Associates LLC which practices privately and for profit but at reduced rates consistent with its non-economic

goals. With regard to the first prong considered by the Court – the attorney's billing practices, the D.C. Circuit held that attorneys "who either practice privately and for-profit but at reduced rates reflecting non-economic goals" are "quite clear[ly] . . . entitled to an award based on the prevailing market rates." *Covington*, 57 F.3d at 1107.

Melehy & Associates LLC (while private and for-profit) engages in a substantial civil rights practice, especially in plaintiff's side employment litigation. Ex. B ¶ 26. The Firm has established normal and customary rates (the rates it usually charges clients in non-contingency cases). *Id*. However, the Firm regularly discounts those rates to a level substantially below market levels, takes some cases on a contingency basis, regularly works with clients who are unable to pay the full amount of a bill in litigation and non-litigation matters, and sometimes forgives fees owed. *Id*. All these actions are taken for public spirited reasons – not because the Firm's attorneys could not command a higher rate, but because the Firm's attorneys are dedicated to pursuing the rights of employees. *Id*. Mr. Melehy accepted representation in this case primarily for non-economic reasons and agreed to represent the Plaintiff on a contingency basis in litigation in this Court. *See* Retainer Agreement, Ex. C; Ex. B ¶ 28. When he took this case, he was aware that the financial risks of such a decision were significant for a small firm like his. *Id*. ¶ 28. However, he was also aware that an injustice might continue unrectified but for his willingness to accept this case on contingency fee basis. *Id*. Thus, consistent with *Save Our Cumberland Mountains, Inc.,* the Firm's normal and customary billing rates should not be used to place a cap on the hourly rates that can be recovered. 857 F.2d at 1523.

## G.   THE COURT SHOULD AWARD CURRENT, NOT HISTORICAL LSI RATES

An award of current rates is commonplace in litigation that has spanned multiple years. *See Brown v. Pro Football, Inc*., 846 F. Supp. 108, 117 (D.D.C. 1994), *rev'd on other grounds*, 50 F.3d

1041 (D.C. Cir. 1995). Courts routinely award current rates since "[p]ayment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime, [an] adjustment to reflect the delay in receipt of payment therefore may be appropriate." *Copeland v. Marshall*, 641 F.2d 880, 893 (D.C. Cir. 1980) (*en banc*); *accord, Pennsylvania v. Delaware Valley Citizen's Council for Clean Air,* 483 U.S. 711, 716 (1987). *See also Murray v. Weinberger*, 741 F.2d 1423, 1433 (D.C. Cir. 1984); *Missouri v. Jenkins*, 491 U.S. 274, 284 (1989).

## II.   THE HOURS DEVOTED TO THIS LITIGATION BY THE FIRM WERE NECESSARY AND REASONABLE

### A. LEGAL PRINCIPALS GOVERNING CALCULATION OF REASONABLE HOURS.

To compute the hours reasonably expended in the litigation, a fee applicant should reference contemporaneous time and expense records. *See Webb v. Bd. of Educ.*, 471 U.S. 234, 238 n.6 (1985); *Heller v. District of Columbia*, 832 F.Supp.2d 32, 50 (D.D.C. 2011). Counsel must then make a good faith evaluation of the contemporaneous records and exclude hours that are excessive or unnecessary. *See Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). An appraisal that time spent was "not reasonably necessary" to the litigation "turns on so many subjective factors that it seldom should be the basis for reduction of an attorney's fee." *Jacquette v. Black Hawk Cnty.*, 710 F.2d 455, 460 (8th Cir. 1983). Accordingly, courts seek to avoid nit-picking disagreements, intransigence, and unreasonable negotiating positions in construing fee petitions and accord some deference to counsel's judgment on the amount of time they considered necessary to prepare and pursue the case. *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1338 (D.C. Cir. 1982) (Tamm, J., concurring).[8]

---

[8] In *Concerned Veterans*, the District of Columbia Circuit Court stated that a properly prepared petition for attorney's fees must provide detailed summaries of work performed and time spent by each attorney based upon contemporaneous time records so that the court can make a reasonably accurate assessment of the hours expended. 675 F.2d at 1327. While detail is required,

There should also be no reduction in the attorney's fees and costs simply because they may be more than the recovery. *See City of Riverside v. Rivera*, 477 U.S. at 574 (affirming a $245,000.00 fee award which was more than seven times the $33,000 recovery). "Because damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief. Rather, Congress made clear that it 'intended that the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases and *not be reduced because the rights involved may be nonpecuniary in nature*.'" *Id*. at 575 (citations omitted). The Court should "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.'" *Id*. at 569 (quoting *Hensley v. Eckerhart*, 461 U.S. at 435).

In this case, the overall relief was significant. Following a status conference, the parties began the mediation process on or about December 13, 2021. ECF No. 84. The settlement agreement provided the following to Plaintiff: (a) a lump sum payment of $150,000; (b) a 2015 performance appraisal with a numerical rating of 3.4; (c) removal from Plaintiff's Official Personnel file any record of Plaintiff's placement on paid administrative leave or suspension without pay; (d) restoration of 150 hours of sick leave and 64 hours of annual leave; and (e) allowing Plaintiff to file a motion for attorney's fees and costs, as determined by the Court. Ex. G.

In addition, this case was legally complex. Plaintiff was not only required to prove discriminatory and retaliatory intent, but also, to succeed on claims 6-11, Plaintiff was required to

---

"[i]t is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." *Copeland v. Marshall,* 641 F.2d 880, 891 (D.C. Cir. 1980) (citations omitted). Thereafter, the court may assess the justification for the hours claimed. *Concerned Veterans*, 675 F.2d at 1327.

prove that Donna Bennett made knowingly false statements when she referred Plaintiff to the Agency's security division. *See* ECF No. 83 at 10.  As Mr. Seldon put it, this was "a daunting task." Ex. D ¶ 54.

### B.  BILLING JUDGMENT EXERCISED

In this case, the Firm kept contemporaneous time records true and accurate copies of which are attached hereto as Exhibit A. Ex. B ¶ 25. Mr. Melehy undertook a preliminary review of the time records and deleted certain time entries, which included duplicate entries, all entries for some timekeepers who had a very small role in the case, and entries for clerical work. *Id.* ¶ 29. All deleted entries do not appear on the time records. *Id.* ¶ 26. Mr. Melehy also no charged all time for the following timekeepers: Attorney Jason Mansman; Law Clerk Maiuyen Lenguyen; Paralegal Mirian Martinez and Paralegal Eric Valdez. *Id.* Plaintiff is seeking fees for the following ten timekeepers: Paralegals Christopher Grau, Emily Wilson, Nicholas Blackmore, and Sydney Chapman, Law Clerks De'Yan Harris and Terrance Scudieri, and Attorneys Omar Vincent Melehy, Robert Porter, Andrew Balashov and Quisi Yang. *Id.*

Prior to the deleted timekeepers and deleted time entries, the aggregate value of all time from all timekeepers in this case (using the Fitzpatrick Matrix for all but Mr. Melehy and Mr. Porter) was $793,113.83. *Id.* ¶ 29. Then, Mr. Melehy undertook a secondary review of the time records and "no charged" time in the exercise of billing judgment. *Id.* The "no-charged" entries appear on the time records but have a "$0.00" value. *Id.* ¶ 30.  Mr. Melehy no-charged all time spent on the following, so long as it was documented separately and fragmentable: (1) the Plaintiff's proposed suspension (20.9 hours no-charged); (2) the EEO administrative proceedings (55.5 hours no-charged); (3) the time spent on the investigative portion of the case (0.8 hours no-charged); (4) the time spent drafting and reviewing pleadings (12.1 hours no-charged); (5) the time

spent on case management (12.3 hours no-charged); (6) the time spent on discovery (30.9 hours no-charged); (7) the time spent on discovery motions (16.2 hours no-charged); (8) the time spent drafting and reviewing dispositive motions (34 hours no-charged); (9) time spent on research (5 hours no-charged); (10) the time spent during settlement (2.1 hours no-charged); and (11) the time spent drafting the fee petition (8.4 hours no-charged). *Id*. ¶ 30. Mr. Melehy also reduced the travel time rate for each timekeeper by one half of their rate. *Id*. ¶ 29. In total, Mr. Melehy no charged 198.2 hours' worth of specific time entries which has a value of $103,899.30. *Id*. ¶ 30.

Mr. Melehy also made the following reductions regarding in the following categories (hereinafter "categorical reductions"): Discovery Motions (10% with a dollar value of $7,488.57); Dispositive Motions (10% with a dollar value of $14,152.75); Fee Petition (10% with a dollar value of $6,153.66). *Id*. ¶ 31.

When (1) the deleted time and deleted timekeepers, (2) the no charged time and (3) the categorical reductions are taken into account, the aggregate dollar value of the voluntary reductions is $136,284.03. The overall reduction of the lodestar of the firm is 17.18%. *Id*. The Court should consider these voluntary reductions when deciding whether the remaining fees which are sought are reasonable.

### C.  THE TIME SPENT BY THE FIRM IS REASONABLE.

The Firm's time was spent in the following categories:

### 1.  Proposed Suspension

| Total Hours | 56.60 |
|---|---|
| Hours After Reduction | 35.70 |
| Total Fees After Reduction | $32,249.70 |

Prior to filing suit, the Firm represented Plaintiff in due process proceedings at the Agency level to challenge her proposed indefinite suspension because her security clearance had been

suspended. Ex. B ¶ 36. The Firm, *inter alia*, provided a written response to the Agency's "Notice of Proposed Suspension," conducted research on the issue (which ultimately wound up being helpful in opposing summary judgment in this case), prepared for and attended a hearing with the deciding official, Adrian Gardner (termed an oral reply), communicated with the Agency about the issue to provide authority in support of Plaintiff's position and argued for reassignment to another position in lieu of a suspension without pay. *See* Time Records, Ex. A.

Plaintiff is entitled to reasonable fees for work related to the suspension. *See Solomon v. Department of the Navy*, EEOC Appeal No. 0720070071, 2008 EEOPUB LEXIS 798 at *10-11 (March 3, 2008); *Santiago v. Department of the Army*, EEOC Appeal No. 01955684, 1998 EEOPUB LEXIS 5549 at *10-11 (October 14, 1998). *See also Parker v. Califano*, 561 F.2d 320, 333 (D.C. Cir. 1977) ("We hold, in sum, that a federal District Court does have discretion, in a Title VII action where the federal employee is the prevailing party, to award attorneys' fees that include compensation for legal services performed prior to filing of the judicial complaint"). *See also Marshall v. Commc'ns Workers of Am.*, Civil Action No. 74-997., 1979 U.S. Dist. LEXIS 9607, at *13 (Sep. 24, 1979) (holding a prevailing plaintiff is entitled to reasonable attorneys' fees for administrative portion of Title VII discrimination case). Although the Plaintiff also filed a complaint with the Office of Special Counsel, the complaint was not successful and Plaintiff has no-charged all time spent on that complaint. Ex. B ¶ 37.

The time was necessary and reasonable because Plaintiff was successful as summary judgment was denied on that claim and Plaintiff recovered (through settlement) monetary benefits based on the suspension and the Agency agreed to expunge her personnel records which were related to the paid and unpaid portions of the suspension. Ex. K.

### 2.     EEO Administrative Proceeding

| Total Hours | 95.4 |
|---|---|
| Hours After Reduction | 39.9 |
| Total Fees After Reduction | $38,369.10 |

The Firm represented Plaintiff in administrative proceedings at the Agency level and before the Equal Opportunity Commission ("EEOC"). There were two separate EEO complaints filed. These two administrative complaints were mandatory pre-requisites to bringing this action, as the Plaintiff was required to exhaust her administrative remedies. Ex. B ¶ 38. Plaintiff contacted the EEO counselor, filed two formal complaints of discrimination (which were amended several times) and then participated in the investigation. *See* Ex. A. During the investigation, Plaintiff's counsel communicated with the investigator, compiled documents, provided them to the investigator, and represented Plaintiff during the investigatory interview. *Id*. In the first case, Plaintiff's counsel also requested a hearing before the EEOC and engaged in some limited litigation activity in the EEOC by filing a motion for default judgment. *Id*. However, Plaintiff no-charged the time expended on the motion for default judgment which was the primary work performed during the litigation phase of the EEOC proceeding. Plaintiff's Counsel terminated that proceeding by filing a withdrawal of the hearing request. Plaintiff's counsel also no charged all time prior to the filing of the first formal complaint pursuant to 29 C.F.R. § 1614.501(e)(1)(iv). Ex. B ¶ 39.

In the second case, Plaintiff filed her action in this Court without even requesting a hearing before the EEOC and before an investigation could be conducted or completed. *Id*. ¶ 40. However, Plaintiff's counsel spent a similar amount of time initiating the complaint, preparing a formal complaint, amending the complaint, and investigating other aspects of the case, including non-pecuniary damages, security clearance issues and potential disability retirement. *Id*.

Thus, the charged time (39.9 hours) was a reasonable and necessary part of the complaint process and is compensable. *See Parker v. Califano*, 561 at 333; *Marshall v. Commc'ns Workers*

*of Am.*, Civil Action No. 74-997., 1979 U.S. Dist. LEXIS 9607, at *13 (Sep. 24, 1979).

### 3.    Factual Investigation

| | |
|---|---|
| **Total Hours** | **36.4** |
| **Hours After Reduction** | **35.6** |
| **Total Fees After Reduction** | **$24,829.00** |

The Firm engaged in robust factual investigation of the Plaintiff's claims both at the administrative stage and after the case was filed in this Court. This was a factually complex case, initially involving 17 separate claims (before they were culled to 11) spanning a period of almost two years, April 2014 to July 2016. *See* ECF No. 1 ¶47. This work involved interviewing Plaintiff on multiple occasions, investigating Plaintiff's medical condition, her non-pecuniary compensatory damages, calculating back pay, reviewing and outlining the report of investigation in the first case (there was no report of investigation in the second case), and speaking with Plaintiff's forensic psychiatrist, Dr. Christiane Tellefsen. Ex. A. This time was minimal and reasonable.

### 4.    Pleadings

| | |
|---|---|
| **Total Hours** | **35.7** |
| **Hours After Reduction** | **23.6** |
| **Total Fees After Reduction** | **$22,459.80** |

The work at issue in this category involved matters related to the judicial complaint filed in this case, amendments to that complaint and service of process. The Firm carefully prepared a 16-page initial complaint, which was sufficiently detailed to avoid a motion to dismiss. ECF No. 1. The Firm then refined the initial draft of the complaint several times, in consultation with the Plaintiff, to make sure there were no errors and that all the claims were properly pled. Ex. A. After the complaint was filed, the Firm worked diligently to ensure that service on the federal government was perfected in the manner required by the Federal Rules and that proof of service

was timely filed. *Id*. As part of this process, Plaintiff sought an extension (which was granted) of her time to effectuate service. *Id*. Finally, Plaintiff amended the complaint shortly before dispositive briefing commenced to eliminate certain claims and clarify and amplify the allegations regarding the remaining claims. ECF No. 39. This time is very reasonable.

### 5. Case Management

| Total Hours | 34.8 |
|---|---|
| Hours After Reduction | 22.5 |
| Total Fees After Reduction | $17,648.80 |

The Firm performed all tasks necessary to effectively manage the progress of litigation and meet the deadlines set by the Court and the Federal and Local Rules of the Court. The work included reviewing court notices, orders, and directives and where appropriate, responding to them, requesting extensions, communicating about them, preparing joint status reports as requested by the Court, contacting chambers regarding scheduling or procedural matters, filing notices of appearances, preparing affidavits of service, cover letters, and undertaking other, similar, tasks which are detailed in the attached billing records (Ex. A). The Firm also communicated with the Plaintiff to apprise her of the progress of her case as it is bound to do. *See* D.C. Rule of Professional Conduct 1.4.

### 6. Discovery

| Total Hours | 416.11 |
|---|---|
| Hours After Reduction | 385.21 |
| Total Fees After Reduction | $207,642.01 |

Discovery in this case was protracted and contentious, lasting nearly 3 years. Ex. B ¶ 41. The overall discovery process can be separated into four parts, written non-expert discovery, written expert discovery, document production and review, and depositions. In addition, discovery was complex because Plaintiff needed to obtain evidence, through the discovery process, that

Defendant acted with discriminatory and retaliatory intent and for claims 6-11, that Donna Bennett also made knowingly false statements in furtherance of her discriminatory and retaliatory acts. ECF No. 83 at 10. This was heavy burden added sever layers of complexity to already challenging discovery.

Non-Expert Written discovery. Plaintiff drafted document requests (35 total) and interrogatories (14 total) to the Agency and responded to the Agency's document requests (37 total) and interrogatories (13 total). Ex. B ¶ 41. The Parties also exchanged Rule 26 initial disclosures early in the case. Ex. A. The task of preparing the initial draft of the request and responses was delegated to a first-year associate (Qiusi Yang) whose billing rate is much lower than that of Plaintiff's lead counsel Mr. Melehy. *See* Ex. A. Mr. Melehy then reviewed and finalized the drafts. *Id*. This resulted in considerable savings in the overall attorneys' fees and costs involved.

Expert Written Discovery. Plaintiff prepared a Rule 26(a)(2) Disclosure of Expert Testimony and served it on the Agency. Ex. A. As part of this process, Plaintiff identified two hybrid experts who she expected to provide opinions relevant to Plaintiff's claim for compensatory damages. The Firm also obtained Plaintiff's medical records, reviewed the records, provided them to the Agency, and communicated with the expert regarding the preparation of her expert report. Ex. A.

Document Production and Document Review. This case involved a voluminous production of documents by the Agency. In total, the Agency produced roughly 8,300 pages of documents in this case over the course of 3 years. Ex. B. ¶ 35. The Firm's attorneys reviewed all these documents and discussed them with the Plaintiff. The Plaintiff also searched for and produced approximately 1,000 pages of her own documents, including email communications, medical records, time and

leave records, and other related documents. *Id*. All these materials needed to be reviewed before being produced to the Defendant. *Id*. This was a lengthy process but was handled efficiently by Plaintiff's counsel who delegated the work to associate attorneys Qiusi Yang and later Andrew Balashov, whose hourly billing rates are much lower than lead counsel Mr. Melehy's LSI Rate.

<u>Depositions</u>. Plaintiff took a total of 15 depositions and Defendant took the Plaintiff's deposition. *See* Ex. B ¶ 34. This was time consuming and necessary given what Plaintiff was required to prove to prevail on her claims.

Therefore, the time spent on discovery was reasonable.

**7.    Discovery Motions**

| | |
|---|---|
| **Total Hours** | **124.1** |
| **Hours After Billing Judgment Reductions** | **107.9** |
| **Total Fees Before 10% Categorical Reduction** | **$74,885.70** |
| **Total Fees After All Reductions, Including 10% Categorical Reduction** | **$67,397.13** |

Discovery lasted almost 3 years, and it was contentious because the Agency threw up roadblocks the whole way, refusing to produce numerous responsive documents or otherwise cooperate in discovery including the scheduling of depositions. Plaintiff recognizes that while she prevailed on most disputes, she did not prevail on all of them. As a consequence, and in addition to billing judgment, Plaintiff has made a voluntary reduction of 10% in this category.

Notably, Plaintiff was forced to request a discovery conference several times to resolve discovery disputes that arose. *See* ECF Nos. 21, 26, 29, 32, 37, 42, 45, 47, 54. Five of these disputes resulted in the Court scheduling a hearing and the Court resolving the issue only after oral argument. Ex. B ¶ 33. The Agency's vexatious conduct in discovery was evident from the time they provided their preliminary responses to Plaintiff's discovery requests. For example, the

Agency refused to produce numerous documents and provide information based on the position that such information was not discoverable in light of *Egan*. *Id*. ¶ 42. The Agency was essentially relying on its substantive defense to block Plaintiff's discovery efforts. This resulted in numerous back-and-forth communications between counsel to try and resolve the dispute (which they were successful in doing to some extent) but ultimately the Plaintiff was forced to request a discovery conference to deal with multiple discovery failures by the Agency. *See* ECF No. 25 (filed May 30, 2018). After the Court held a discovery conference, Plaintiff's Counsel spoke with Defense Counsel on April 5, 2018, and wrote three letters identifying deficiencies and memorializing some agreements. ECF No. 29. Plaintiff's counsel sent letters on March 28, April 6 and April 17, 2018, for which no substantive responses were received. *Id*. On Friday, June 8, 2018, Counsel for both parties held a one-hour teleconference to resolve their disputes but could not. *Id*. Plaintiff renewed her request for a discovery conference on June 13, 2018. ECF No. 29. Despite Defendants' efforts to supplement their production to cure the deficiencies, issues remained, and Plaintiff sought another discovery conference on September 7, 2018. ECF No. 32. By September 27, 2019, the Plaintiff was still attempting to persuade the Agency to cure the deficiencies in its responses to Plaintiff's first set of discovery requests served on December 22, 2017 (document requests) and January 17, 2018 (interrogatories). ECF No. 37.

When Plaintiff attempted to schedule depositions in early 2020, the Agency prevented Plaintiff from doing so. Agency counsel effectively hamstrung Plaintiff by delaying for weeks on end in responding to Plaintiff's inquiry as to whether he would accept service on behalf of certain Agency witnesses or otherwise make them available. When Agency counsel finally responded to indicate he had not authority to accept service on behalf of many important witnesses, Plaintiff's counsel requested the addresses and contact information for the witnesses to facilitate service, but

Agency counsel dragged his feet in providing it, forcing Plaintiff to seek another discovery conference with the Court. ECF No. 42; Ex. B ¶ 42. Plaintiff withdrew this request based on representations made by opposing counsel but he never followed through, and Plaintiff renewed her request for a discovery conference on this same issue in April 2020. ECF No. 46. Throughout all of discovery, Agency counsel would only respond and act if and when Plaintiff involved the Court. So, while the Court did not rule on each discovery dispute, the Plaintiff's request for the Court's intervention caused the Agency to act and work cooperatively with Plaintiff to resolve the matter.

Plaintiff would not have obtained the documents she needed to successfully depose the 15 witnesses if her counsel had not been persistent.

**8.    Dispositive Motion.**

| | |
|---|---|
| **Total Hours** | **194.67** |
| **Hours After Billing Judgement Reduction** | **160.67** |
| **Total Fees Before 10% Categorical Reduction** | **$141,527.47** |
| **Total Fees After All Reductions** | **$127,374.72** |

Plaintiff reduced the fees in this category because the Court required the parties to revise and resubmit their briefs to conform to the Court's rules. Plaintiff had not initially identified the asserted facts in Defendant's motion that she disputed. So, following the Court's order, the Plaintiff made those changes to the Statement of Disputed Facts. This work was in addition to rather than duplicative of the work Plaintiff had previously done. However, Plaintiff believes that some extra hours were spent since there were two filings. As a consequence, in addition to voluntary deletion or no charge of individual time entries, Plaintiff voluntarily reduced the attorneys' fees in this category by 10%.

The remaining fees sought are reasonable given the considerable amount of work that went into successfully opposing the Agency's motion for summary judgment. The work done can be divided into two components, drafting the Plaintiff's statement of facts, and the statement of material facts in dispute and drafting the memorandum of law in opposition to the motion.

The factual record in this case is vast, and Plaintiff's counsel had to be familiar with the record in its entirety to draft a comprehensive factual statement and to effectively dispute the Defendant's factual narrative. To put it into context, Defendant moved for summary judgment on all the claims alleged by Plaintiff in the amended complaint. ECF No. 60-2. The period which was relevant to the Plaintiff's claims spanned three years, from April 2014 to May 2017. *See* ECF No. 39 ¶¶ 31-46. The combined documents produced in discovery relevant to Plaintiff's claims total 9,200 pages (approximately 8,200 produced by the Agency and almost 1,000 produced by Plaintiff), the deposition testimony of 16 witnesses (including Plaintiff), and additional affidavit testimony contained in the Report of Investigation. The Parties' respective factual statements reflected the size of the record. In its brief-in-chief, Defendant relied upon 53 exhibits totaling 253 pages. *See* ECF Nos. 60-3 to 60-56. Plaintiff relied upon 54 separate exhibits which totaled 479 pages. *See* ECF Nos. 65-1 to 65-54.

Plaintiff's ability to overcome the Defendant's *Egan* defense on summary judgment also depended on her counsel's knowledge and command of the record and required counsel to weave an effective narrative to establish that the responsible management official (Donna Bennet) acted with discriminatory and/or retaliatory intent and made knowingly false statements to the security investigators which led to Plaintiff's clearance being suspended. *See* ECF No. 72 and Exhibits. This was a difficult standard to establish by any measure and it required extra effort to support these claims with circumstantial evidence.

The memorandum in opposition to the Defendant's motion also required considerable efforts. Defendant argued the following: (a) that claims 6-11 should be dismissed as non-justiciable under *Egan*; (b) all eleven claims should be dismissed for failure to exhaust administrative remedies; and (c) eight claims should be dismissed because the underlying actions were not adverse or materially adverse. ECF No. 70-1. Plaintiff needed to address each argument raised by Defendant or risk having the Court deem that argument conceded.

The most difficult argument was that Plaintiff fell within the *Rattigan* exception to the *Egan* defense. This is a complicated issue that needed to be carefully addressed. The *Egan* decision essentially put all employment decisions that touched on national security and security clearances off limits in employment litigation. Ex. D ¶¶ 52-55. To get around *Egan*, Plaintiff argued that Donna Bennett's conduct fell within the exception in *Rattigan v. Holder*, 643 F.3d 975 (D.C. Cir. 2011). *Id*. *Rattigan* held that a retaliatory referral for security review is actionable under Title VII, so long as the security review itself – which *Egan* makes clear is an unreviewable decisional process committed exclusively to the Executive Branch under Article II of the Constitution – was not placed at issue. *Id*. Successfully arguing the *Rattigan* exception applies is extremely difficult, because the Court of Appeals did not provide much guidance in terms of what a case, that fits within the exception, looks like factually. *Id*. ¶ 54. Here, using the extensive summary judgment record, Plaintiff's counsel successfully argued that Bennett made knowingly false statements when she referred Plaintiff to the security division. This was time-consuming.

Second, Defendant argued that Plaintiff failed to exhaust administrative remedies. ECF No. 70. Although Defendant conceded this point in its answer to the complaint, Plaintiff needed to rely on additional arguments because Plaintiff was unsure of whether Defendant would seek leave to amend its answer to withdraw the concession or whether the Court would find that issue

34

dispositive. Plaintiff again needed to rely on extensive law and the summary judgment factual record, to argue that Defendant waived the right to make the argument for other reasons and because Defendant interfered with the EEO process by actively discouraging Plaintiff from initiating her complaint. ECF No. 72 at 10-11.  This required a great deal of time and effort.

Third, Defendant argued that the eight claims she was making were either adverse or materially adverse or that they were part of a pattern of harassment. ECF No. 72 at 12. This again was time consuming.  Plaintiff prevailed on most of these claims, as the Court only dismissed two minor claims, including one claim for failure to accommodate Plaintiff, which were not a core part of Plaintiff's case. *See* ECF No. 83 at 20-22.  Overall, Plaintiff successfully opposed summary judgment and should recover all fees she requested, after the voluntary reductions.

### 9.    Settlement

| Total Hours | 69.2 |
|---|---|
| Hours After Reduction | 67.1 |
| Total Fees After Reduction | $52,209.30 |

Plaintiff attempted to settle this case throughout these proceedings and prior to this action being filed. On September 30, 2016, prior to the filing of this lawsuit, Agency Counsel Ryan Chapline requested that Plaintiff provide a settlement proposal. Ex. B ¶ 44. On October 5, 2016, Plaintiff's counsel sent a settlement proposal to Mr. Chapline. *Id*. However, the Agency never responded to this settlement proposal. *Id*. In Spring, 2020 Ryan Chapline and Kenneth Adebonojo requested that Plaintiff send a new settlement proposal. *Id*. On March 2, 2020, Plaintiff sent a new settlement proposal to Defendant's counsel. *Id*. Again, the Agency never responded to this settlement proposal. *Id*.

It was only after this Court denied summary judgment on December 2, 2021, that Defendant became receptive to discussing settlement and agreed to mediation. *Id*. Plaintiff's

counsel then prepared for mediation by compiling an attorney fee and cost calculation, compiling a summary of Plaintiff's medical records and compiling a mediation statement. *Id*. This process resulted in settlement of all claims except for Plaintiff's claim for attorney's fees and costs. The time spent on settlement was reasonable and necessary. *Id*.

### 10.   Research

| | |
|---|---|
| **Total Hours** | **17.5** |
| **Hours After Reduction** | **12.5** |
| **Total Fees After Reduction** | **$9,314.80** |

Plaintiff performed legal research in connection with disputing the Defendants' objections to discovery, while trying to perfect service on the Agency after the Complaint was filed, and in connection with drafting the opposition to the motion for summary judgment. *See* Ex. A. The legal professional at Melehy & Associates LLC who conducted the research, and the specific topic that was researched, as well as the purpose of the research, is identified in the time records attached hereto as Exhibit A. This time was minimal and reasonable.

### 11.   Travel

| | |
|---|---|
| **Total Hours** | **4.6** |
| **Hours After Reduction** | **4.6** |
| **Total Fees After Reduction** | **$1,952.50** |

Plaintiff's counsel seeks compensation for time spent traveling to the Agency's headquarters to represent Plaintiff when she provided an oral reply in response to the proposed suspension, and time spent traveling to this D.C. District Court to attend the initial conference. Travel time is being billed at half of the applicable LSI rate. It was reasonable and necessary.

### 12.   Fee Petition

| | |
|---|---|
| **Total Hours** | **122.70** |
| **Hours After Bill Judgment Reduction** | **114.30** |
| **Total Fees Before 10% Categorical Reduction** | **$61,536.60** |

| Total Fees After All Reductions | $55,382.94 |
|---|---|

Plaintiff is entitled to attorney's fees for work done drafting a fee petition. *Am. Wrecking Corp. v. Sec'y of Labor*, 364 F.3d 321, 330-31 (D.C. Cir. 2004). The time spent is reasonable because this fee petition required considerable work given the amount of attorneys' fees at issue. Plaintiff compiled an evidentiary record to support her entitlement to hourly rates at the rates set forth in the LSI Matrix. Plaintiff needed to secure an expert witness, Robert "Bob" Seldon, Esquire, obtain survey data, declarations from other attorneys, data from other cases where LSI rates were awarded, and provide the Court with demonstrative evidence showing the Court what the survey rates would be now, if they were adjusted for inflation using the LSI Matrix's adjustment factor. Ex. A.

The Plaintiff also had to succinctly explain to the Court in the argument section of the brief the work that was done in this case and why it was reasonable. Plaintiff had to effectively reduce 7 years of case history into a mere 10 pages. Given the duration of this case, the many disputed issues, and the amount of attorneys' fees and costs at issue, the time spent drafting this fee petition was reasonable.

## IV.   THE PLAINTIFF IS ENTITLED TO HER REASONABLE COSTS.

Plaintiffs seek total costs of $39,668.96, incurred during the pendency of this case. *See* Ex. B ¶ 45. The Court has discretion to award litigation costs in addition to the costs that are taxed against the losing party, in this case the Defendant, under 28 U.S.C. § 1920. *See* 42 U.S.C. § 12205 and 29 U.S.C. § 794(a)-(b)). "An award of costs for copying, faxing and postage . . . are customarily included in fees awards." *Kaseman v. District of Columbia*, 329 F. Supp. 2d 20, 28 n.7 (D.D.C. 2004); *DL v. District of Columbia*, 194 F. Supp. 3d 30, 106 (D.D.C. 2016) (awarding non-taxable costs in part under 29 U.S.C. § 794 of the Rehabilitation Act); *see also Sexcius v. District of*

*Columbia*, 839 F. Supp. 919, 927 (D.D.C. 1993) (noting that "[r]easonable photocopying, postage, long distance telephone, messenger, and transportation and parking costs are customarily considered part of a reasonable 'attorney's fee'"); *Bailey v. District of Columbia*, 839 F. Supp. 888, 891-92 (D.D.C. 1993).

Such costs are shifted to the   defendant provided that they are reasonable.  *See Bailey*, 839 F. Supp. at 892. Importantly, the costs recoverable as part of an attorneys' fee award consist only of "related *nontaxable* expenses." Fed. R. Civ. P. 54(d)(2)(A) (emphasis added).  In accordance with the presumption that costs are awarded to the prevailing party, "federal courts have placed on the unsuccessful parties some burden of showing circumstances sufficient to overcome the presumption favoring the prevailing party." *Guevara v. Chukewuemeka Onyewu,* 943 F. Supp. 2d 192, 195 (D.D.C. 2013). As a result, courts "have rarely denied costs to a prevailing party whose conduct has not been vexatious when the losing party has been capable of paying such costs." *Id.*

Plaintiff seeks the following non-taxable costs:

## A.    COSTS WHICH ARE ALSO SOUGHT IN THE BILL OF COSTS.

Plaintiff has, simultaneously with this fee petition, filed a Bill of Costs and Memorandum in Support of Bill of Costs seeking taxable costs pursuant 28 U.S.C. §1920 and this Court's guidelines as set forth in Local Rule 54.1. To the extent any of the costs in the Bill are not taxed, Plaintiff asks that the Court award them as reasonable and necessary litigation expense that the Firm would ordinarily charge a fee-paying client. Plaintiff incorporates by reference herein her Bill of Costs and the arguments therein. An itemized list of all costs incurred in this case (including those which are part of the Bill of Costs), along with the backups are attached hereto as Exhibit L. The total costs sought in the Bill of Costs are $39,668.96.

## B.    OTHER NON-TAXABLE COSTS

The following costs are passed along to the Firm's fee-paying clients and are not part of the hourly rates charged by the Firm. Ex. B ¶ 45. Moreover, the Firm has paid these costs on behalf of the Plaintiff. *Id*. The expenses sought are reasonable and were verified by Omar Vincent Melehy to be accurate and supported with the Firm's billing records. *See* Ex. L; Ex. B (Subsection VI "Costs").

**Postage/Federal Express - $439.50.** Postage costs are recoverable in fee-shifting litigation. *See Collette v. District of Columbia*, Civil Action No. 18-1104 (RC), 2021 U.S. Dist. LEXIS 47346, at *13 (D.D.C. 2021) (awarding postage in IDEA case); *Lucero v. Parkinson Constr. Co.*, Civil Action No. 18-515 (RC), 2020 U.S. Dist. LEXIS 138045, at *9 (D.D.C. 2020) (awarding postage in FLSA action); *Craig v. Mnuchin*, Civil Action No. 14-1340 (RC), 2018 U.S. Dist. LEXIS 198148, at *79 (D.D.C. Nov. 21, 2018) (awarding postage as part of reasonable attorneys' fee in Title VII case). Federal Express overnight delivery costs are also recoverable and were necessary in this case to send time sensitive documents. *Bremer v. Gutierrez*, Civil Action No. 03-1338 (JR), 2008 U.S. Dist. LEXIS 139820, at *7 (D.D.C. 2008) (awarding prevailing Plaintiff in Rehabilitation Act case $130.00 in federal express charges in addition to postage expenses). The postage expenses are verified by Mr. Melehy, who also explains how the Firm tracks and allocates such expenses to the client. Ex. B ¶ 49. They are also documented in Exhibit L attached hereto.

**Copy Costs in Excess of $300.00 - $3,482.00.** Plaintiff has incurred a total of $3,435.40 in photocopy expenses in this case. While Rule 54.1 caps the taxable amount of photocopy expenses at $300.00 (plus the cost of making copies of exhibits admitted into the evidentiary record), Plaintiff seeks all her photocopy expenses. The Court has discretion to award photocopy expenses beyond the limits set in U.S.C. 1920 and Local Rule 54.1. *See James v. District of*

39

*Columbia*, 302 F. Supp. 3d 213, 215 (D.D.C. 2018) (holding, in an IDEA case, that the attorneys' fees award normally includes reasonable copy expenses).

Plaintiff's reasonable copying costs are recoverable as a traditional element of "reasonable attorney's fees." 28 U.S.C. § 2412(d)(1)(C)(2)(A); *Harvey v. Mohammed*, 951 F. Supp. 2d 47, 69 n.18 (D.D.C. 2013). *See also West Virginia University Hospitals, Inc. v. Casey,* 499 U.S. 83 (1991) (traditional elements of an attorney's fee may be recovered under statutes shifting "a reasonable attorney's fee"); *Northcross v. Bd. of Ed. of Memphis City Schools,* 611 F.2d 624 (6th Cir. 1979), *cert. denied,* 447 U.S. 911, 64 L. Ed. 2d 862, 100 S. Ct. 2999, 100 S. Ct. 3000 (1980) (photocopying is a traditional element of an attorney's fee). Accordingly, to the extent any photocopy costs are not taxed as part of the bill of costs, Plaintiff seeks them as part of her attorney's fee award.

The purpose of photocopies, and how the costs are tracked, is detailed in the Declaration of Omar Vincent Melehy attached as Exhibit A to the Memorandum in Support of Bill of Costs and incorporated by reference by Plaintiff herein. In total, Plaintiff's counsel printed 16,007 pages of non-color copies and 468 pages of color copies. Ex. B. ¶ 50. The color copies are billed by the Firm at \$.50 per page and the non-color copies at \$.20 per page. *Id*. The photocopy costs are also itemized and supported with the Firm's billing records in Exhibit L, attached hereto.

**Westlaw Legal and LexisNexis Legal Research Database Charges - \$4,460.58**. In the D.C. Circuit, computerized legal research charges are passed on to the client on a cost basis and are reimbursed by the courts as costs. *Adolph Coors Co. v. Truck Ins. Exch*., 383 F. Supp. 2d 93, 95 (D.D.C. 2005); *Harvey v. Mohammed*, 951 F. Supp. 2d 47, 70 (D.D.C. 2013) (allowing legal research costs as part of the attorneys' fee award to the prevailing party in a case brought under 42 U.S.C. § 1988). In this case, Plaintiff was billed for the Firm's use of the Westlaw and LexisNexis

database. The research that was done, the person who did the research and the purpose of the research is discernable from the time records attached hereto as Exhibit A, which contains a separate research category. *See* Ex. A. The Firm tracks the amount of time spent by timekeepers at the Firm using either Westlaw or LexisNexis. Ex. B ¶ 51. On a monthly basis, the cost associated with the time spent using the database is prorated to the client for whom the research was done. *Id*. The Firm's billing records of costs (Exhibit K), contain backups showing how the legal research database costs were allocated in this case. Thus, the full amount of costs should be awarded. Plaintiff also utilized the Pacer database for research purposes to review documents and briefs filed in other cases for research purposes. *Id*.

**Travel Expenses – Mileage/Lodging/Parking - $1,190.22**. The Plaintiff seeks reimbursement of her travel expenses such as mileage, and lodging and those of her counsel. The date of travel, the nature of the expenses, the purpose of the travel, the total mileage, and the associated cost, are set forth in Exhibit L and this information is verified by Mr. Melehy. *See* Ex. B ¶ 47. Supporting documentation is also attached as part of Exhibit L for each of the costs incurred except for the mileage, which is separately attested by Mr. Melehy. Ex. B ¶¶ 46-47. In 2019, the mileage reimbursement rate used to calculate the total allowance for mileage was $.58 per mile. *Id*. In 2020 the appliable rate was $.575 per mile. *Id*. The travel to Philadelphia was necessary to depose Gerald Singleton, who the Agency would only make available if Plaintiff agreed to travel to his current place of employment. *Id*. ¶ 46. Plaintiff attended the deposition as well and both Plaintiff and counsel needed to stay overnight because making the round trip in one day would be too difficult and prohibitive. Especially for Plaintiff who has a medical condition which makes it difficult for her to drive the 378-mile round trip from her home to Philadelphia in one day. *Id*. Plaintiff also traveled from her home to counsel's office to attend the depositions of Grigoleit,

Wilson and Cousins on March 5, 2020. *Id.* Travel expenses are recoverable as part of the attorneys' fee award in cases brought under the Rehabilitation Act. *Bremer v. Gutierrez*, Civil Action No. 03-1338 (JR), 2008 U.S. Dist. LEXIS 139820, at *7 (D.D.C. 2008).

**Expert Witness Fees**. Expert fees are recoverable under fee-shifting statutes like Title VII. *Makray v. Perez*, 159 F. Supp. 3d 25, 27 (D.D.C. 2016) (noting that the Court may allow a prevailing party expert fees as part of a costs award in Title VII case). They have also been awarded under the Rehabilitation Act. *Bremer*, 2008 U.S. Dist. LEXIS 139820, at *7 (D.D.C. 2008) (awarding $6,382.75 in expert/consultant fees). Here, Plaintiff seeks fees paid to her medical expert, Dr. Tellefsen to prepare her expert report. Plaintiff needed Dr. Tellefsen's testimony at trial to establish her entitlement to compensatory damages. Plaintiff also seeks fees for her expert witness Robert "Bob" Seldon, Esquire, who Plaintiff's counsel retained to support Plaintiff's request for attorneys' fees at the LSI rates for attorneys' Omar Vincent Melehy and Robert Porter. The fees paid to Dr. Tellefsen and Mr. Seldon are supported with documentation which is contained in Exhibit L.

**Courier Expenses - $45.00.** Plaintiff needed the services of a courier to deliver a copy of the Plaintiff's mediation binder to the Honorable Magistrate Judge Faruqui in advance of the mediation. Ex. B ¶ 52. This expense is adequately documented (Ex. L) and is reasonable.

### CONCLUSION

For the reasons stated, this Court should grant this motion and award Plaintiff the following amounts along with any supplemental fees requested in connection with the reply brief:

A.    **Fees:**        **$656,829.80**

B.    **Costs:**      **$39,668.96**

C.    **Total:**       **$696,498.76.**

Respectfully submitted,

/s/Omar Vincent Melehy
Omar Vincent Melehy
DC Bar No.: 415849
MELEHY & ASSOCIATES LLC
8403 Colesville Road, Suite 610
Silver Spring, MD 20910
Tel: (301) 587-6364
Fax: (301) 587-6308
Email: ovmelehy@melehylaw.com
*Attorneys for Plaintiffs*