## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CINDY BRACKETT,

    Plaintiff,

        v.                                                          Civil Action No. 17-988 (JEB)

ALEJANDRO MAYORKAS, Secretary,
Department of Homeland Security,

    Defendant.

## <u>MEMORANDUM OPINION</u>

"In law," satirist Samuel Butler observed, "nothing is certain but the expense."  Butler, unfortunately, was not quite right.  In this employment dispute, the expenses, too, escape agreement.  After a partial grant of summary judgment and half a year of negotiations, the Department of Homeland Security and Plaintiff Cindy Brackett have settled the latter's claim of disability discrimination.  Because the parties cannot agree on the amount of legal expenses due, Brackett has returned to this Court with a Motion for Attorney's Fees.  The Court will grant it, but with substantial reductions.

## I.  Background

The Court assumes familiarity with the facts underlying this dispute and summarizes them only briefly here.  <u>See</u> <u>Brackett v. Mayorkas</u>, No. 17-988, 2021 WL 5711936, at *1–3 (D.D.C. Dec. 2, 2021) (describing facts).  In 2015, Brackett filed two administrative complaints with her employer, a sub-agency within the Department of Homeland Security.  <u>See id.</u> at *1, *3.  She then filed this lawsuit against the Secretary in May 2017, alleging disability-based

discrimination and retaliation pursuant to the Rehabilitation Act.  See id. at *3.  The litigation did not kick off in earnest until two-and-a-half years later, when Brackett filed a Second Amended Complaint.  Id.  That pleading "allege[d] one count, unhelpfully broken into eleven subparts."  Id.

The Court granted Defendant's subsequent Motion for Summary Judgment, but only in part.  It held that although Brackett's case pertained to a typically nonreviewable security-classification decision, she had established a material dispute about whether the revocation of her clearance arose from deliberately false and retaliatory statements made against her.  See id. at *4–5, *10.  The Court found that several of Brackett's claims could move forward, including her allegations that DHS had improperly discriminated or retaliated against her when it suspended her security clearance and diminished her responsibilities.  Id. at *9–10.  It dismissed her remaining claims, including her "far from clear" claims that DHS had failed to reasonably accommodate her and had created a hostile work environment.  See id. at *11–12.

After half a year of negotiations, the parties settled for $150,000 and on all but one issue: how much Defendant owed Brackett in attorney fees and costs.  See ECF No. 84 (Order of Referral for Mediation); ECF No. 94 (Joint Status Report); ECF 100-8 (Settlement Agreement) at 1.  Plaintiff now contends that she is owed $742,758, including for her legal team's work on this fee Motion.  See ECF No. 100-1 (Pl. Mem. in Support of Mot. for Attorney's Fees) at 1; ECF No. 109 (Pl. First Supplement to Mot. for Attorney's Fees) at 4 (describing corrections to initial request and adding request for hours spent on this fee litigation).  Defendant balks and describes why this request is unreasonable but stops short of proposing specific cuts.  See ECF

Nos. 106 (Def. Opp.), 111 (Def. Opp. to Supp. Mot.).

## II.   Legal Standard

The parties agree that in this lawsuit brought under the Rehabilitation Act, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."  29 U.S.C. § 794a(b); see Settlement Agreement, ¶ 6.  "The usual method of calculating reasonable attorney[ ] fees is to multiply the hours reasonably expended in the litigation by a reasonable hourly fee, producing the 'lodestar' amount."  Bd. of Trs. of Hotel & Rest. Emps. Local 25 v. JPR, Inc., 136 F.3d 794, 801 (D.C. Cir. 1998).  "The party seeking fees has the . . . burden of establishing the reasonableness of the fees requested" and must do so for "both the number of hours and the hourly rate."  Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec., 218 F. Supp. 3d 27, 38, 47 (D.D.C. 2016).  Supporting documentation, such as time records reflecting the work of each attorney, "must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended."  Role Models Am., Inc. v. Brownlee, 353 F.3d 962, 970 (D.C. Cir. 2004) (citation omitted).  Courts maintain broad discretion to modify a requested fee award.  See Conservation Force v. Jewell, 160 F. Supp. 3d 194, 203 (D.D.C. 2016) (citing Judicial Watch, Inc. v. U.S. Dep't of Commerce, 470 F.3d 363, 369 (D.C. Cir. 2006)).

## III.   Analysis

Plaintiff seeks fees for four attorneys and six support staff from employment firm Melehy & Associates.  See ECF No. 108 (Reply) at 3; Mot. at 2.  The Court will begin with the most contentious issue: what billing rates to charge for the two most experienced attorneys Brackett employed.  It will then turn to the reasonableness of the number of hours that her legal team

expended on this litigation, including on the merits and on this request for fees.

    A.    <u>Appropriate Rates</u>

The court is tasked with "fixing the prevailing hourly rate . . . with a fair degree of accuracy." <u>Covington v. District of Columbia</u>, 57 F.3d 1101, 1109 (D.C. Cir. 1995) (internal quotation omitted). In determining that reasonable hourly rate, courts turn to what are known as the <u>Covington</u> factors: "(1) 'the attorneys' billing practices'; (2) 'the attorneys' skills, experience, and reputation'; and (3) 'the prevailing market rates in the relevant community.'" <u>Salazar ex rel. Salazar v. District of Columbia</u>, 809 F.3d 58, 62 (D.C. Cir. 2015) (quoting <u>Covington</u>, 57 F.3d at 1107). Factor one is not so relevant here. Although Defendant cites in a footnote to the low billing rates in Plaintiff's retainer agreement, <u>see</u> Opp. at 13 n.6, courts do not look to that rate where, as here, a private attorney worked "at reduced rates reflecting non-economic goals." <u>Covington</u>, 57 F.3d at 1107; <u>see</u> ECF No. 100-3 (Declaration of Omar Vincent Melehy), ¶ 28 (describing discounted, contingency-based representation in this case). As for the second factor, Defendant does not contest, and the Court need not detail here, the skill, experience, and reputation of the attorneys that Brackett engaged. <u>See</u> Opp. at 11–22.

It is the third factor that looms large. To establish the prevailing market rate, "a fee applicant must 'produce satisfactory evidence — <u>in addition</u> to the attorney's own affidavits — that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience[,] and reputation.'" <u>Eley v. District of Columbia</u>, 793 F.3d 97, 100 (D.C. Cir. 2015) (quoting <u>Blum v. Stenson</u>, 465 U.S. 886, 895 n.11 (1984)). In determining appropriate rates, courts in this district have often employed a schedule of hourly fees based on years of attorney experience, the first of which was developed in <u>Laffey v. Northwest Airlines, Inc.</u>, 572 F. Supp. 354 (D.D.C. 1983), <u>rev'd on other grounds</u>, 746 F.2d 4 (D.C. Cir. 1984). <u>See</u> <u>Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of</u>

Justice, 142 F. Supp. 3d 1, 16 (D.D.C. 2015).

The parties agree that this litigation is sufficiently complex that the relevant market rate can be determined by some updated version of the Laffey Matrix.  See Mot. at 2; Opp. at 12–13; J.T. v. District of Columbia, No. 19-989, 2023 WL 355940, at *13 (D.D.C. Jan. 23, 2023) ("In its choice of alternative fee matrix, . . . defendant apparently concedes that the relevant market is that of complex federal litigation . . . ."); Salazar, 809 F.3d at 64 (finding defendant "acquiesce[ed] in the notion that the litigation at issue qualifies as complex federal litigation" when it proposed alternative USAO update to the Laffey Matrix).  Both also agree that the appropriate rate for four members of the legal team is set by a spin-off of the Laffey Matrix that they call the Fitzpatrick Matrix, a model schedule of fees for complex federal litigation in D.C. that Professor Brian Fitzpatrick developed for the United States Attorney's Office for the District of Columbia.  See Mot. at 2; Opp. at 12–13.

They diverge, however, when it comes to the remaining two attorneys — name partner Omar Vincent Melehy and associate Robert Porter.  For them, Plaintiff turns to a different Laffey Matrix: the Legal Services Index (LSI) Matrix.  That table sets the rate for Melehy at $997 per hour given his three-plus decades of experience and at $829 per hour for Porter given his ten-plus years of experience.  See Mot. at 6.  Defendant, on the other hand, maintains that the Fitzpatrick Matrix should set rates across the board, including for Melehy and Porter.  See Opp. at 1, 7; ECF No. 100-9 (Fitzpatrick Matrix) at 1 (setting rates approximately $200 lower).  The parties next disagree on whether current, inflation-adjusted or historical rates should apply, whichever matrix the Court selects.  The Court will take those two rate-related disputes in turn.

      1. *Prevailing Market Rates for Melehy and Porter*

As fee "matrices are somewhat crude, the matrix's proponent usually" should point to

additional evidence of the prevailing market rate, which can include "affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases [or] evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases." DL v. District of Columbia, 924 F.3d 585, 589 (D.C. Cir. 2019) (internal quotation marks omitted).  Although the "initial burden to establish an hourly rate lies with the fee applicant, which can then be rebutted with other evidence by the counterparty," when "both parties submit competing matrices, backed up by supporting affidavits and evidence, this framework functionally collapses into one question: Which matrix better reflects the prevailing market rates in the relevant community?" Lewis v. District of Columbia, No. 15-521, 2018 WL 6308722, at *6 (D.D.C. Dec. 3, 2018).

Although Brackett does not offer evidence supporting the methodology or development of the LSI Matrix, its history is well documented.  In 1989, a litigator reviewed both the National Law Journal's survey of rates and the rates charged by attorneys from seven major law firms to create a table of rates, which lawyers bring up to date by adjusting with a legal-services-specific inflation factor.  See DL, 924 F.3d at 589–90; Lewis, 2018 WL 6308722, at *5.  As the D.C. Circuit recognized in DL, common concerns about the LSI Matrix include "(1) the age of the raw data; (2) whether it captures a truly representative sample of complex federal litigators; and (3) the grouping of attorneys into just five experience bands." 924 F.3d at 594.  Although it found the LSI Matrix more palatable than the alternative matrix the USAO had proposed at the time, the Circuit acknowledged that "as time passes, the [LSI M]atrix may well — like shoulder pads, eight-tracks, and other '80s fads before it — be losing its shine." Id.  Today, more than 71% of a given LSI rate "consists entirely of inflation adjustments." J.T., 2023 WL 355940, at *15; see

also ECF No. 106-5 (Statement of Interest of the United States filed in J.T.) at 15.

To make up for these defects and to meet her burden to show that the LSI Matrix reflects the relevant market rate for Melehy and Porter, Plaintiff cites to (1) declarations from two employment lawyers, and (2) other comparable cases in which courts awarded fees based on that Matrix. See Reply at 3–4. These get her just over the line.

Begin with the declarations. Plaintiff asks that this Court treat the first declarant, Robert Seldon, as an "expert for the purposes of this motion," Mot. at 10, even though Seldon himself acknowledges that "no witness can be qualified as an 'expert' on United States law." ECF No. 100-5 (Declaration of Robert C. Seldon), ¶ 22. Seldon concludes that the rate Plaintiff seeks for Melehy is below the prevailing market rate for employment attorneys of his caliber. See id., ¶ 67. He relies on his own close familiarity with Melehy's work, a handful of fee disputes with which he is familiar, a consultation of the National Law Journal's 2014 survey of billing rates, which lists the self-reported rates charged by twelve Washington, D.C., law firms, and on the NLJ's 2017 survey, which lists the rates for a mere three. Id., ¶¶ 6, 37. Even if the Court treats Seldon as an expert with respect to his subjective assessment of market rates, it is not inclined to assign his declaration much weight. The 2014 NLJ survey from which he extrapolates rates "does not . . . distinguish billing rates for partners and associates in terms of years of experience" or even "the type of work performed." Prunty v. Vivendi, 195 F. Supp. 3d 107, 114 (D.D.C. 2016). "[I]t is not a scientific study and" relies on "self-reported rates, which firms may reduce in practice." Blackman v. District of Columbia, 677 F. Supp. 2d 169, 176 (D.D.C. 2010), aff'd, 633 F.3d 1088 (D.C. Cir. 2011). He further distorts those numbers by considering only the "high-end partner billing rate" in that data while casting the "low end billing rate" — which appears more in line with Fitzpatrick rates — entirely aside. See Seldon Decl., ¶¶ 66–67 ("[T]he

average low end billing rate for a partner is $721.25[.]").  Finally, there is obvious bias in employment lawyers' bolstering each other's rates.  If Melehy is successful in obtaining a high rate, Seldon can then claim in his own next case that this is the prevailing rate to which he himself is entitled.  His declaration, though it certainly constitutes relevant evidence, cannot shoulder the disproportionate weight Plaintiff places on it.

Brackett's second declarant is another employment lawyer familiar with fees charged in this type of litigation.  See ECF No. 100-6 (Declaration of Nicholas Woodfield), ¶ 4.  He adds little of value.  Id., ¶ 12 (asserting with no objective support that Plaintiff's requested rates are "consistent with the prevailing market rates").

In addition to the declarations, however, Plaintiff also identifies the equivalent or higher rates sought by other employment lawyers in related fee litigation.  See Mot. at 9 & n.5, 15–16.  Some involve outlier rates or distinguishable legal services.  See, e.g., Thomas v. Moreland, No. 18-800, 2022 WL 2168109, at *5 (D.D.C. June 16, 2022) (awarding LSI rates as sanctions in defamation case); Ray v. CLH New York Ave. LLC, No. 19-2841, 2022 WL 2340708, at *5 (D.D.C. June 29, 2022) (granting $1,010 hourly rate for former head of global law firm's D.C. office).  Still, the data includes three sets of relevant comparators.  The first is a handful of inflation-adjusted rates charged by four lawyers at two different D.C.-based civil-rights and employment-focused law firms.  See ECF No. 100-11 (Declaration of Emily Wilson), ¶¶ 9–10 (providing inflation-adjusted rates for a Relman Colfax associate comparable to Porter at $844.80 and for Littler Mendelson partner comparable to Melehy at $1,015); Seldon Decl., ¶¶ 81–83 (listing higher-than-LSI rates charged by two other Relman Colfax attorneys).  The second is a set of cases involving litigation pursuant to the Individuals with Disabilities Education Act in which courts granted LSI rates.  See B.J. v. District of Columbia, No. 19-2163,

2020 U.S. Dist. LEXIS 249956, at *1, *8 (D.D.C. 2020), adopted, 2021 WL 5992052 (D.D.C.,

Feb. 10, 2021); U.F. v. District of Columbia, No. 19-2164, 2020 WL 4673418, at *1 (D.D.C.

Aug. 12, 2020).  Third, Brackett cites to a set of cases decided six or more years ago —

including two Title VII cases — in which courts awarded LSI rates.  See Mot. at 9 n.5 (listing

cases).  Although DHS protests that these are "a handful of carefully selected, but

unrepresentative, data points," Opp. at 15, they sufficiently buttress the LSI Matrix to pass the

burden onto Defendant.  See DL, 924 F.3d at 591.

DHS, for its part, maintains that the LSI Matrix involves more archeology than

economics: it excavates survey data more than three decades old, then dusts off the cobwebs with

a blunt inflation factor.  Defendant thus proposes looking to the Fitzpatrick Matrix, which uses

the same inflation-adjustment factor as the LSI Matrix but relies on a more recent and a broader

underlying dataset.  It considers the fees sought in 86 cases from 2013 to 2020 and then lays out

a more finely tuned rate schedule that lists a different market rate for each additional year of

experience a lawyer brings instead of bundling experience levels into bands.  See Opp. at 13;

Fitzpatrick Matrix at 1, 3.  "Given this fee matrix's novelty, no court has yet had occasion to

consider the reasonableness of the Fitzpatrick Matrix's rates in an [employment-discrimination]

case," J.T., 2023 WL 355940, at *10, and so none of the cases listed above on which Plaintiff

relies considered this alternative.  As a testament to its success, some plaintiffs have begun to

rely on the Fitzpatrick Matrix in their fee requests, as Brackett does here for the remaining

members of her legal team.  See, e.g., Naumes v. Dep't of the Army, No. 21-1670, 2023 U.S.

Dist. LEXIS 114634, at *17 (D.D.C. July 5, 2023).  In both published opinions in this district in

which the LSI and Fitzpatrick matrices have faced off, the latter has won out.  See J.T., 2023 WL

355940, at *14–15; Louise Trauma Ctr. LLC v. Dep't of Homeland Sec., No. 20-1128, 2023 WL

3478479, at *4 (D.D.C. May 16, 2023) (explaining that "Fitzpatrick Matrix rates presumptively apply" in complex federal litigation and citing J.T.).

The Government homes in on J.T., 2023 WL 355940, in which Judge Beryl A. Howell concluded that the Fitzpatrick Matrix's methodology met a defendant's rebuttal burden and established a more reasonable market rate than the LSI Matrix.  See id. at *14–18.  Reviewing the same Fitzpatrick Declaration that DHS has filed here against a competing declaration of a plaintiff's economist, Judge Howell found that the Fitzpatrick Matrix (1) relies on more recent data, thereby minimizing the distorting effects of forecasting current rates from decades-old survey data, (2) draws from a larger and more transparent dataset, and (3) breaks rates out into more precise gradations (providing rates for 36 experience levels where the LSI Matrix employs only five).  See id. at *15–16.  Unlike previous USAO matrices rejected by the D.C. Circuit, the Fitzpatrick Matrix also "limits itself to the relevant market for complex federal litigation in the District of Columbia."  Id. at *16.  The Court agrees.  Although Brackett attempts to distinguish J.T. as having concerned a less complex IDEA dispute, Judge Howell's analysis of the relevant market and the LSI Matrix's methodological flaws did not turn on the complexity of that litigation; indeed, complexity was not even at issue.  See id. at *13 ("[D]efendant apparently concedes that the relevant market is that of complex federal litigation. . . ."); Mot. at 6–7.

Plaintiff's attempts to question the Fitzpatrick Matrix's methodology are unavailing.  She first argues that its dataset is under-representative because her declarant, Seldon, looked through the Fitzpatrick dataset and found that it excluded two fee disputes that he is familiar with and in which plaintiffs were awarded LSI-based fees.  See Mot. at 17; Seldon Decl., ¶¶ 72–74.  That is likely because the Fitzpatrick dataset excludes "rates that did not appear to be free market transactions, including cases explicitly or implicitly based on an existing fee matrix."  ECF No.

106-4 (Declaration of Brian T. Fitzpatrick), ¶ 9.  Plaintiff offers no compelling explanation of the problem with this strategy; nor is the Court convinced that Fitzpatrick's decision to exclude two cases that awarded LSI rates improperly skewed his 86-case dataset.  By contrast, "[t]he exact data points from which [the creator of the LSI Matrix] derived his rates seem lost to history, if they were ever made available at all."  J.T., 2023 WL 355940, at *16.

Brackett also attempts to levy a hodgepodge of other methodological complaints.  She opens with a procedural one: that DHS never provided all of the "assumptions that [Fitzpatrick] made or summaries he may have reviewed" when he developed his Matrix.  See Mot. at 18. Having reviewed Fitzpatrick's declaration and the dataset he relied on — both of which are available online — the Court does not see what more support could be necessary.  See Fitzpatrick Decl., ¶ 1; Civil Division:  Attorney's Fees, United States Attorney's Office for D.C., https://perma.cc/D7ZU-TFZD (last visited July 26, 2023).  Brackett next posits without support that "Dr. Fitzpatrick's formula is not a reliable measure of the legal market," supposedly because "the text he relied upon" to develop that formula "is not a study devoted to the legal market." Mot. at 17–18; see Seldon Decl., ¶ 77 ("I cannot lay claim to being a mathematician, . . . but there is no way for a court to know if the formula Dr. Fitzpatrick . . . devised is a reliable measure.").  That Fitzpatrick employed lessons from an economics rather than a legal textbook to blend data from the cases he reviewed into a linear model reflects "common economic practice." J.T., 2023 WL 355940, at *17; Fitzpatrick Decl., ¶ 14.  Brackett tries to play one last card: she points out that since one of Fitzpatrick's 86 cases involved rates higher than those she seeks here, her proposed rate for Melehy "is supported by [Fitzpatrick's] data."  Mot. at 18; see also Seldon Decl., ¶¶ 83–84.  It would have been better to fold, as this last argument only highlights the

benefits of an 86-case dataset: it avoids exactly this kind of cherry picking.

The LSI Matrix is indeed like "other '80s fads before it . . . losing its shine." <u>DL</u>, 924 F.3d at 594; <u>see also</u> <u>Citizens for Resp. & Ethics in Wash.</u>, 142 F. Supp. 3d at 21–22 (describing LSI Matrix's "serious shortcomings").  This is not to say that it has gone entirely the way of the boombox.  But some cassette tapes do fade, and given the evidence presented here, the LSI Matrix is an inferior measure of the prevailing market rate for Melehy and Porter.  The Court finds it appropriate to instead apply Fitzpatrick Matrix rates across the board.

### 2. *Historical versus Current Rates*

A second rate-related question remains: which of the annual updates to the Fitzpatrick Matrix applies to past billed hours?  Plaintiff asks the Court not to award her fees at the matrix rates applicable at the time that the legal work was performed, but to instead apply the higher, inflation-adjusted rates that apply today to work performed years ago.  Her request invokes an axiom that any economist would recite in her sleep: a dollar today is worth more than one tomorrow.  "[P]ayment today for services rendered long in the past" therefore "deprives the eventual recipient of the value of the use of the money in the meantime."  <u>West v. Potter</u>, 717 F.3d 1030, 1034 (D.C. Cir. 2013) (quotation marks and citation omitted).  The standard approach is to award "[p]ayment at a matrix's current rates," which "approximates the appropriate adjustment for inflation and thereby simulates what the attorney would have earned had she been promptly paid at the time she performed the work."  <u>J.T.</u>, 2023 WL 2716687, at *1; <u>see</u> <u>Lewis</u>, 2018 WL 6308722, at *10 ("Given the difficulty in calculating the true present value of past rates, courts in this district — including this one — have often opted for [this] approach.").

Although Defendant contends that current rates are awarded only when the delay in payment is a defendant's fault, <u>see</u> Opp. at 20–21, and Plaintiff argues that "[t]he fault of the

Defendant should not factor into the calculus" at all, see Reply at 9, neither is quite right.  In assessing whether to award current or historical rates, courts may consider, among other factors, whether the delay in payment was "unusually long []or attributable to the defendant's dilatory or stalling conduct." West, 717 F.3d at 1034; see also Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 556 (2010) ("[A]n enhancement may be appropriate where an attorney assumes these costs in the face of unanticipated delay, particularly where the delay is unjustifiably caused by the defense.").  They may conversely consider whether any "long periods of delay" were "attributable to choices made by Plaintiffs, not impropriety or foot-dragging by the defense." Hartman v. Pompeo, No. 77-2019, 2020 WL 6445873, at *16 (D.D.C. Nov. 3, 2020).  The determination is discretionary.  Compare Hernandez v. Chipotle Mexican Grill, Inc., 257 F. Supp. 3d 100, 103, 113 (D.D.C. 2017) (awarding current rates in employment-discrimination litigation spanning three years); Young v. Sarles, 197 F. Supp. 3d 38, 51 (D.D.C. 2016) (same in First-Amendment litigation spanning less than two years), with Tridico v. District of Columbia, 235 F. Supp. 3d 100, 107 (D.D.C. 2017) (applying historical rates to employment-discrimination litigation spanning two years).

Plaintiff maintains that "historical rates would grossly undercompensate" her because "her counsel took the case on a contingency basis" and because this dispute "had been ongoing for more than eight years" (i.e., two years at the agency level and more than five years of litigation and settlement discussions).  See Reply at 2.  She sets the blame for this timeline squarely on DHS's shoulders, pointing to (1) its nearly year-long delay in acting on her complaint to the agency, (2) the cumulative year of delay created by the extensions Defendant sought and received from this Court, and (3) DHS's "dragg[ing] its feet throughout the discovery process," to which she ascribes three more years of delay.  Id. at 9–11.  Instead of addressing

these allegations, DHS points its finger back at Plaintiff for taking two-and-a-half years to file her Second Amended Complaint and for prolonging discovery with unnecessary depositions and requests to "use the Court as a substitute for" good-faith negotiation.  See Opp. at 2, 5–6.

Both parties caused avoidable delays throughout this litigation.  See, e.g., ECF No. 69 (Transcript of May 27, 2021 Hearing) at 3, 7 (Court: "I think we have to extend deadlines for you both to do it right. . . . [Y]ou guys are just talking past each other.").  If Defendant proceeded through discovery at a tortoise's pace, Plaintiff has at times been Aesop's hare — she veered off course several times throughout this litigation, unnecessarily prolonging the pleading and discovery stages.  See, e.g., Brackett, 2021 WL 5711936, at *3 (describing Brackett's pleading as "unhelpfully broken into eleven subparts").  Given that both parties were partially responsible for the extent of the delays, however, and wary of declaring a winner in this race to the bottom and of discouraging contingency-based representation in cases that drag on longer than expected, the Court will stick to the standard approach and award current rates.  It will do so, however, only within reason.  Hence, although DHS unhelpfully declines to clarify its position on which Fitzpatrick Matrix rates constitute the "current" ones, the Court rejects Plaintiff's request to use the recently published 2023 Fitzpatrick Matrix instead of the 2022 Matrix that she relied on when she first filed her Motion.  See Mot. at 6 (seeking 2022 rates); Supp. Mot. at 1 (seeking update to since-released 2023 rates); Opp. to Supp. Mot. at 1–3 (taking no position).  The 2022 rates will apply even to the subset of hours worked on this fee litigation in 2023.  Otherwise, the Court would be rewarding Plaintiff's efforts to drag out this fee litigation.

With the finish line in sight, the Court makes one final clarification before assessing the hours for which Plaintiff seeks fees.  Defendant understands Brackett not only to be seeking current, inflation-adjusted matrix rates for past work, but also to improperly apply the rate

corresponding to attorneys' current experience level to work those attorneys performed while less experienced.  See Opp. at 21–22.  Plaintiff seeks no such experience-based retroactivity.  See Reply at 2; see, e.g., ECF No. 109-1 (Revised Time Entries) at 13, 54 (charging experience-based rates for attorney Andrew Balashov).  Fees will be awarded at the 2022 Fitzpatrick rate corresponding to an attorney's level of experience at the time the work was performed.  Now on to hours.

> B.   Appropriate Hours

The parties next dispute the number of hours for which Brackett may recover fees.  Plaintiff bears the burden here, too.  See Covington, 57 F.3d at 1107.  A party requesting fees must exercise its "billing judgment" and exclude from its request hours that "are excessive, redundant, or otherwise unnecessary."  Hensley v. Eckerhart, 461 U.S. 424, 434 (1983).  The Supreme Court has instructed courts to take up this mantle when a party fails to do so and "exclude from [the] fee calculation hours that were not 'reasonably expended.'"  Id. (quoting S. Rep. No. 94-1011, at 6 (1976)).  District courts have "wide discretion to reduce individual fee entries."  Nat'l Venture Cap. Ass'n v. Nielson, 318 F. Supp. 3d 145, 152 (D.D.C. 2018) (citation omitted).  Still, courts must not become "green-eyeshade accountants," sequentially weighing the propriety of each entry listed in the movant's request.  Fox v. Vice, 563 U.S. 826, 838 (2011).  The goal here is "rough justice."  Id.

DHS argues that Plaintiff overstaffed this case and billed excessive time on straightforward tasks.  See Opp. at 22–23.  The Court generally agrees: Brackett employed a small army of four attorneys, four paralegals, and two law clerks in this single-plaintiff employment dispute, several of whom often billed simultaneously.  See Reply at 12–14.  By contrast, DHS devoted "one Assistant U.S. Attorney at a time" to the case.  See Opp. at 23.  Although Brackett's case involved some legal and factual complexities, they amounted to a

fraction of those present in the one similarly staffed single-plaintiff discrimination case to which she cites as justification for her staffing.  See Reply at 12–13; Hernandez, 257 F. Supp. 3d at 107 (citing among other justifications for staffing a "plaintiff's limited familiarity with her former employer's policies and practices, the location of . . . relevant witnesses in Colorado, the need for translators for the plaintiff and a number of witnesses who spoke only Spanish").  Recognizing, however, that Defendant "must present detailed and specific reasons why the applicant's request should be reduced or denied," Beck v. Test Masters Educ. Servs., Inc., 73 F. Supp. 3d 12, 17 (D.D.C. 2014); see also Reply at 11, the Court will apply cuts for overstaffing and overbilling only to those billing categories in which DHS identifies specific examples, before cutting Plaintiff's request for fees incurred in filing this Motion (i.e., fees on fees) proportionally.  The Court will refer throughout this discussion to the figures in Plaintiff's First Supplement to her Motion, which corrects various calculation errors, removes charges for some items, and adds in hours for fees on fees expended since filing her Motion.  See Supp. Mot. at 1.

      1.  *Fees on the Merits*

DHS specifically disputes the reasonableness of the hours that Brackett's legal team spent on agency proceedings regarding her proposed suspension, and on the pleadings, discovery, and dispositive briefing in this Court.  The Court will take each in turn.

      a.  Proposed Suspension

Before this litigation began, Brackett's counsel assisted her in responding to a Notice of Proposed Suspension that her employer issued against her.  The Court agrees with DHS that the nearly 40 hours billed on this pre-litigation action, totaling over $30,000 in requested fees, are excessive.  See Opp. at 23.  Defendant points as an example to the more than $10,000 that Brackett requests for Porter's work on drafting a response to her proposed suspension.  Id.;

16

Revised Entries at 3–4.  Several additional entries for reviewing and revising various emails and letters to the individuals involved also appear excessive and redundant.  See Revised Entries at 4. The Court will apply a 20% haircut to the hours billed in this category.

          b.  Pleadings

Defendant is correct to point out that Brackett amended her Complaint twice, filing what became the operative Complaint two-and-a-half years after she filed her first.  See Brackett, 2021 WL 5711936, at *3; Opp. at 25.  Even that pleading was "unhelpfully broken into eleven subparts," leaving the Court to wade through two claims in it that were "not made out with particular lucidity."  Brackett, 2021 WL 5711936, at *3.  Plaintiff attempts to make lemonade, explaining that her years-long effort to pare down her Complaint ultimately made this litigation more manageable for all involved.  See Reply at 14–15.  It did exactly the opposite, delaying expeditious litigation on a fact-heavy dispute that turned in part on the memory of various deponents.  The juice cannot have been worth the squeeze.  The Court appreciates Brackett's effort to no-charge some particularly excessive hours in this category, see id. at 15–16, but finds that those minor cuts are not enough, as her fee table still includes multiple charged entries for revisions to a Complaint that should not have required such heavy refashioning.  See Revised Entries at 15.  Another 20% cut applies here.

          c.  Discovery and Discovery Motions

Brackett's entries for discovery and discovery motions comprise nearly half of the fees she requests, totaling over 480 hours and nearly $280,000 in fees.  See Revised Entries at 1. These are excessive.  One choice example is Brackett's decision to depose a witness with no knowledge of the relevant dispute.  See ECF No. 106-1 (Transcript of Deposition of Jeffrey Krauss) (Melehy: "Is it fair to say that you have absolutely no knowledge of this Cindy Brackett

investigation matter?"  Krauss: "No, I didn't."  Melehy: "I don't have any further questions of this witness.").  To modify the popular millennial phrase, that deposition could have been an email.  Yet Brackett's time entries are bloated with hours billed in preparation for the anticlimactic exchange.  See, e.g., Revised Entries at 31.

The Court is also not inclined to reward Brackett's filing of unnecessary discovery motions.  See Opp. at 5; ECF Nos. 27, 43 (demonstrating Brackett's resort to this Court for minor disputes that parties ultimately resolved among themselves).  Acknowledging her excessive reliance on this Court during the discovery period, Brackett has applied a 10% trim to the hours in this category.  See Reply at 16, 18.  She still, however, maintains that resorting to the gavel was necessary to secure DHS's cooperation.  See id. at 18.  The Court finds that account generally unpersuasive and will replace Plaintiff's 10% reduction in the discovery-motions category with a larger 30% reduction to the hours billed in both the discovery and discovery-motions categories.

### d.  Dispositive Motions

The final merits category, and the second-most-expensive category overall, contains over 140 hours, totaling nearly $130,000, billed for briefing on summary judgment.  See Revised Entries at 1.  Defendant correctly points out that the Court ordered Brackett to refile her Opposition to comply with the Local Rules, see Brackett, 2021 WL 5711936, at *3, and Brackett should not be rewarded for hours attributable to her counsel's failure to comply with the straightforward requirement that she delineate responses to Defendants' statement of facts and include a background summary of the facts.  See Opp. at 6; Hearing Tr. at 8 (observing that although both parties needed to refile, "it will take less time for the [G]overnment" to fix errors in its filings than for Brackett to fix hers).  Although the Court appreciates Brackett's effort to

no-charge hours spent on the non-compliant factual summary and her application of a 10% reduction to the hours in this category, see Reply at 20–21, the time billed for reviewing and revising the briefing remain unreasonable even after those adjustments.  The Court will therefore replace Brackett's 10% reduction with a higher, 15% reduction.

*  *  *

As Defendant has not specifically challenged them, the Court will not apply cuts to Plaintiff's requested costs or to the hours spent on her remaining merits categories, which appear in the schedule that follows.  See Reply at 2.  The Court's reductions amount to an award of approximately 70% of the merits fees that Plaintiff sought.

| Category | Fees Sought After Brackett's Categorical Reductions | Fees Sought Applying Fitzpatrick Rates and Before % Reductions | Court's Categorical % Reductions | After Court's Categorical Reductions |
|---|---|---|---|---|
| PROPOSED SUSPENSION | $ 32,249.70 | $ 24,036.90 | 20% | $ 19,229.52 |
| ADMINISTRATIVE PROCEEDINGS | $ 38,369.10 | $ 28,670.60 | 0% | $ 28,670.60 |
| FACTUAL INVESTIGATION | $ 25,340.10 | $ 20,734.40 | 0% | $ 20,734.40 |
| PLEADINGS | $ 20,967.60 | $ 15,840.60 | 20% | $ 12,672.48 |
| CASE MANAGEMENT | $ 16,315.80 | $ 13,107.60 | 0% | $ 13,107.60 |
| DISCOVERY | $ 212,750.03 | $ 178,838.51 | 30% | $ 125,186.96 |
| DISCOVERY MOTIONS | $ 67,060.44 | $ 62,152.90 | 30% | $ 43,507.03 |
| DISPOSITIVE MOTIONS | $ 128,325.16 | $ 112,474.47 | 15% | $ 95,603.30 |
| RESEARCH | $ 9,477.40 | $ 7,699.00 | 0% | $ 7,699.00 |
| SETTLEMENT | $ 52,131.90 | $ 40,707.90 | 0% | $ 40,707.90 |
| TRAVEL | $ 1,971.35 | $ 1,541.25 | 0% | $ 1,541.25 |
| AGREEMENT ENFORCEMENT | $ 1,663.60 | $ 1,352.00 | 0% | $ 1,352.00 |
| COSTS | $ 40,313.22 | $ 40,313.22 | 0% | $ 40,313.22 |
| *Merits Subtotal* | $ 646,935.40 | | | $ 450,325.26 |
| *Effective Merits Award Rate* | *70%* | | | |

### 2. Fees on Fees

The Court concludes by considering whether to add in fees for time spent on this fee litigation.  Courts in this district have concluded that awards of "fees on fees" should be reduced to exclude the amount of time spent unsuccessfully defending fee requests denied by the court.  See, e.g., Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Veterans Affs., No. 96-1740,

1999 WL 33740260, at *5–6 (D.D.C. Apr. 13, 1999); see also INS v. Jean, 496 U.S. 154, 163 n.10 (1990) ("[F]ees for fee litigation should be excluded to the extent that the applicant ultimately fails to prevail in such litigation.").

Plaintiff is correct to point out that Defendant's Opposition is silent on the hours she charged for her fee petition, likely because she has preemptively applied a 10% categorical reduction to them.  See Reply at 11; Opp. at 22–25.  As a result of this concession, the Court will not further cut Plaintiff's requested fees on her opening fee brief.  In her Supplement to the Motion, however, Plaintiff has added in additional hours for time spent on the Reply in support, and Defendant now argues that this addition is "patently unreasonable."  See Opp. to Supp. Mot. at 1.  The Court agrees — Plaintiff seeks to bill nearly 50 hours, and charge over $40,000, for her Reply brief alone.  See Revised Entries at 1.  The Court, accordingly, will follow the lead of other courts in this district and award Plaintiff "the same percentage of fees for fee litigation as it does for fees on the merits."  Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec., 982 F. Supp. 2d 56, 61 (D.D.C. 2013).  It does so by applying the effective award rate derived from its cuts to the fees on everything else (70%) to Brackett's requested fees for her Reply brief after they are modified to reflect Fitzpatrick rates, resulting in an effective categorical reduction to Brackett's requested fees on her Reply brief of 32%.  The final award comes out to $526,101.70 and is summarized below.

| Category | Fees Sought After Brackett's Categorical Reductions | | Fees Sought Applying Fitzpatrick Rates and Before % Reductions | | Court's Categorical % Reductions | After Court's Categorical Reductions | |
|---|---|---|---|---|---|---|---|
| PROPOSED SUSPENSION | $ | 32,249.70 | $ | 24,036.90 | 20% | $ | 19,229.52 |
| ADMINISTRATIVE PROCEEDINGS | $ | 38,369.10 | $ | 28,670.60 | 0% | $ | 28,670.60 |
| FACTUAL INVESTIGATION | $ | 25,340.10 | $ | 20,734.40 | 0% | $ | 20,734.40 |
| PLEADINGS | $ | 20,967.60 | $ | 15,840.60 | 20% | $ | 12,672.48 |
| CASE MANAGEMENT | $ | 16,315.80 | $ | 13,107.60 | 0% | $ | 13,107.60 |
| DISCOVERY | $ | 212,750.03 | $ | 178,838.51 | 30% | $ | 125,186.96 |
| DISCOVERY MOTIONS | $ | 67,060.44 | $ | 62,152.90 | 30% | $ | 43,507.03 |
| DISPOSITIVE MOTIONS | $ | 128,325.16 | $ | 112,474.47 | 15% | $ | 95,603.30 |
| RESEARCH | $ | 9,477.40 | $ | 7,699.00 | 0% | $ | 7,699.00 |
| SETTLEMENT | $ | 52,131.90 | $ | 40,707.90 | 0% | $ | 40,707.90 |
| TRAVEL | $ | 1,971.35 | $ | 1,541.25 | 0% | $ | 1,541.25 |
| AGREEMENT ENFORCEMENT | $ | 1,663.60 | $ | 1,352.00 | 0% | $ | 1,352.00 |
| COSTS | $ | 40,313.22 | $ | 40,313.22 | 0% | $ | 40,313.22 |
| *Merits Subtotal* | $ | **646,935.40** | | | | $ | **450,325.26** |
| *Effective Merits Award Rate* | | *70%* | | | | | |
| | | | | | | | |
| FEE PETITION | $ | 55,478.34 | $ | 53,571.80 | 10% | $ | 48,214.62 |
| FEE PETITION - REPLY | $ | 40,344.00 | $ | 39,595.20 | 32% | $ | 27,561.82 |
| *Total Fees Requested* | $ | **742,757.74** | | | *Total Fees Awarded* | $ | **526,101.70** |

## IV.   Conclusion

For these reasons, the Court will grant in part and deny in part Plaintiff's Motion for

Attorney's Fees.  A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date: August 9, 2023